[Crim. No. 21523. Feb. 11, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY CHUN-HO SZETO, Defendant and Appellant.

24

**COUNSEL**

Edward W. Suman, under appointment by the Supreme Court, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci, Ronald E. Niver and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CLARK, J.**—Defendant appeals from judgment entered on a jury verdict convicting him of being an accessory to a felony (Pen. Code, § 32) and of possession of a sawed-off shotgun (Pen. Code, § 12020).[1] The principal question presented by his appeal is whether the testimony of an accomplice was sufficiently corroborated. The standard we must follow in reviewing this question is well settled. "Unless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably *tend* to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*People v. Perry* (1972) 7 Cal.3d 756, 774 [103 Cal.Rptr. 161, 499 P.2d 129]; original italics.) Because the corroborating evidence here was properly admitted

---

[1]Statutory references are to sections of the Penal Code unless otherwise noted.

and did reasonably tend to connect defendant with the crimes, the implied finding of the jury must be upheld. The judgment will be affirmed.

The charges against defendant arose out of the Golden Dragon massacre. In that incident members of a Chinese youth gang (the Joe Boys) entered a crowded restaurant in San Francisco's Chinatown and opened fire on the patrons, intending to revenge themselves on members of two rival Chinese youth gangs (the Wah Ching and Hop Sing), but instead killing and wounding innocent bystanders. Defendant was convicted of aiding the killers by disposing of their weapons, which included a sawed-off shotgun.

Saturday evening, 3 September 1977, members of the Joe Boys met at the home of Burt and Sandra Rodriguez in Pacifica and discussed retaliating against the Wah Ching and Hop Sing for the murder of a Joe Boy named Felix Huie. At 2 a.m., 4 September 1977, Tom Yu, one of the Joe Boys involved in the aforementioned discussion, received a telephone call at the Rodriguez residence, informing him that members of the Wah Ching and Hop Sing were then in the Golden Dragon Restaurant. The Joe Boys armed themselves with weapons they had stored in a closet in the Rodriguez house. Melvin Yu took a .45 automatic rifle, Curtis Tam a sawed-off shotgun, and Peter Ng a conventional shotgun and a .38 handgun. Chester Yu drove them to the Golden Dragon in a car stolen earlier in the evening by Peter Cheung. At 2:40 a.m., with Chester Yu remaining in the car, Melvin Yu, Tam and Ng entered the restaurant. Although their intended victims escaped injury, 5 bystanders were killed and 11 wounded. Chester Yu drove the killers back to the Rodriguez residence where they replaced the weapons in the closet.

■ As stated, the principal question presented by this appeal is whether the testimony of an accomplice—Chester Yu—was sufficiently corroborated. Before summarizing the evidence of defendant's involvement, we shall briefly review the familiar rules governing corroboration of accomplice testimony.

Section 1111 provides in pertinent part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

"To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. (*People* v. *Luker* (1965) 63 Cal.2d 464, 469 [47 Cal.Rptr. 209, 407 P.2d 9].) 'The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient itself to establish every element of the offense charged.' (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556]; see also *People* v. *Luker, supra*, 63 Cal.2d 464, 469; *People* v. *Holford* (1965) 63 Cal.2d 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423].) 'Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant.' (*People* v. *Santo* (1954) 43 Cal.2d 319, 327 [273 P.2d 249].) '[T]he corroborative evidence may be slight and entitled to little consideration when standing alone.' (*People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal. Rptr. 683, 348 P.2d 116].)" (*People* v. *Perry, supra*, 7 Cal.3d 756, 769.) Finally, "[u]nless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably *tend* to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*People* v. *Perry, supra*, 7 Cal.3d at p. 774; original italics.)

Chester Yu testified as follows concerning defendant's role in the affair: Chester, the killers and other Joe Boys slept at the Rodriguez residence the balance of the night. The following morning defendant, who had not been there earlier, brought wonton soup to them. While eating the soup the gang heard a radio broadcast concerning the killings. Peter Ng, Melvin Yu and others then took the guns out of the closet, sawed them into pieces in the Rodriguez garage and told defendant to dump them into San Francisco Bay. Defendant put the guns into the trunk of his car and, accompanied by Chester Yu, drove to a location on the bay near the airport, where he threw the guns into the water. During the drive defendant told Chester he was quite familiar with the area where he would dispose of the guns, having worked at the

nearby Kee Joon's Restaurant. Chester later led the police to the site and the guns were recovered.

Chester Yu's testimony was corroborated by independent evidence that defendant had a *motive* to aid the killers in escaping punishment, namely, to assist fellow Joe Boys in gaining revenge upon the Wah Ching and Hop Sing for the earlier slaying of Felix Huie. ██ ██ ██ San Francisco Police Officer Timothy Simmons, an expert witness on Chinese youth gangs in San Francisco, testified as follows: Defendant was a member of the Joe Boys.[2] For several years the Joe Boys had been struggling with the Wah Ching and Hop Sing for control of the extortion racket in San Francisco's Chinatown. The gang warfare had resulted in 50 murders and assaults, each incident leading to further retaliation. Two months before the Golden Dragon incident, four Joe Boys were shot in a battle between that gang and the other two at the Ping Yuen housing project. One of the Joe Boys, Felix Huie, died. Defendant along with other Joe Boys attended Huie's funeral.

██ Chester Yu's testimony was further corroborated by the testimony of Burt Rodriguez, Sandra Rodriguez and Peter Cheung. Their testimony bore upon defendant's *opportunity* to commit the crimes. According to Burt and Sandra Rodriguez, the Joe Boys, whom they did not know to be gang members, had free access to their house. Burt testified the killers, as well as other Joe Boys, were in the house when he went to sleep that Saturday night and were still there when he awoke Sunday morning. Peter Cheung also testified the killers were at the Rodriguez residence Saturday night. Burt testified the Joe Boys brought the murder weapons to his house a month before the killings and that, as far as he knew, the guns were still in the closet that Saturday night. Peter Cheung testified the guns were in the closet that night. Sandra Rodriguez testified defendant brought wonton soup to the house Sunday morning; Burt could not positively identify defendant as the person who brought the soup but testified defendant was similar in appearance to that person. Burt testified the guns were not in the closet Sunday evening.

---

[2]Peter Cheung, himself an admitted Joe Boy, also testified that defendant was a Joe Boy.

Cheung's involvement in the Golden Dragon incident was limited to providing the stolen car used by the killers. He was not involved in any way in the disposal of the weapons. Therefore, as Cheung was not subject to prosecution for the same offense as defendant, Cheung's testimony, unlike that of Chester Yu, was not that of an accomplice. (Cf. *People* v. *Wallin* (1948) 32 Cal.2d 803 [197 P.2d 734].)

Finally, the assistant manager of Kee Joon's Restaurant testified defendant had been employed there in May of 1977.

Because the corroborating evidence does tend to connect defendant with the commission of the crimes of which he has been convicted, we must uphold the jury's verdict. (*People* v. *Perry, supra,* 7 Cal.3d at p. 774.)

We now consider defendant's other contentions.

■ Defendant contends he was denied his right to a speedy trial under section 1382. Under that section, if a defendant is not brought to trial within 60 days after the filing of the indictment or the information, the action must be dismissed "unless good cause to the contrary is shown." The information in this case was filed on 19 July 1978. Trial began on 3 October 1978, having been continued beyond the 60-day period on the People's motion and over defendant's objection. What constitutes good cause for delay is a matter lying within the sound discretion of the trial court. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 570 [162 Cal.Rptr. 431, 606 P.2d 738]; *In re Lopez* (1952) 39 Cal.2d 118, 120 [245 P.2d 1].) The trial court did not abuse its discretion in granting the two-week delay here. To convict defendant of being an accessory to the Golden Dragon slayings, the People had to prove, among other elements, the underlying felonies. (See § 32; *People* v. *Prado* (1977) 67 Cal.App.3d 267, 271 [136 Cal.Rptr. 521]; *People* v. *Hardin* (1962) 207 Cal.App.2d 336, 341 [24 Cal.Rptr. 563].) The witnesses and physical evidence required in proving those felonies were unavailable before the 60-day period expired, being tied up, first, in the trial of Curtis Tam (16 Aug. 1978 to 5 Sept. 1978) and then of Melvin Yu (6 Sept. 1978 to 26 Sept. 1978). The two-man team that prosecuted all of the Golden Dragon cases began this trial just one week after concluding the Melvin Yu prosecution. Clearly, good cause was shown for the brief delay.

Defendant contends the delay was unnecessary because he offered to stipulate to the underlying felonies. The People are not required to accept a stipulation that is ambiguous in form or limited in scope or that would deprive them of the legitimate force of material evidence. (*People* v. *Hall* (1980) 28 Cal.3d 143, 153 [167 Cal.Rptr. 844, 616 P.2d 826]; *Fuentes* v. *Tucker* (1947) 31 Cal.2d 1, 7 [187 P.2d 752].) The stipulations offered by defendant were clearly unacceptable. In opposing the continuance, defendant offered to stipulate that "five people were killed

and eleven people were wounded at the Golden Dragon on September 4, 1977." During the trial, after five witnesses had testified for the People, defendant objected to further testimony on the grounds it would be cumulative, offering to stipulate "there were three principals inside the restaurant." The proffered stipulations were obviously inadequate in that they did not cover, for example, the identities of the principals, the gang affiliation of the principals or the fact that members of rival gangs were in the restaurant.

Under a separate argumentative heading, defendant makes a related claim—that evidence relating to the murders was cumulative and inflammatory. It was neither.

■ In another related claim, defendant, relying on *People* v. *Modesto* (1967) 66 Cal.2d 695 [59 Cal.Rptr. 124, 427 P.2d 788], contends the prosecutor engaged in prejudicial misconduct by referring to the fact that Curtis Tam and Melvin Yu had been convicted of charges arising out of the Golden Dragon killings. Defendant's reliance on *Modesto* is misplaced. The defendant in *Modesto* was being tried for the third time for the same murders, death penalty judgments in the two previous trials having been reversed on appeal, for instructional error in the first trial and for *Escobedo*[3] error in the second. In the third trial the prosecutor improperly referred to the prior trials, arguing to the jury that 24 other jurors and 2 other trial judges had been convinced of the defendant's guilt and had sentenced him to death. "In thus invoking the beliefs of other judges and juries, predicated upon evidence with which defendant was not confronted at the instant trial, counsel for the prosecution clearly overstepped the bounds of permissible argument. Whatever the guilt of the defendant, he is surely entitled to a trial uninfected by hearsay references to conclusions which others have reached on the basis of unspecified evidence, much of which has subsequently been ruled improper, and none of which defendant could effectively challenge in the present trial." (66 Cal.2d at pp. 715-716, fns. omitted.) This case is clearly distinguishable from *Modesto*. Without belaboring the obvious, suffice it to say that defendant did not and does not claim that Curtis Tam and Melvin Yu were innocent. Therefore, any error in referring to their convictions was plainly harmless.

■ Defendant contends the trial court erred in denying his motion for change of venue based on prejudicial pretrial publicity. ■ A

---

[3]*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758].

change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief a fair trial cannot be had. (*People v. Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]; *Frazier v. Superior Court* (1971) 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694]; *Maine v. Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) ■ Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. (*People v. Welch, supra*, 8 Cal.3d 106; *People v. Tidwell* (1970) 3 Cal.3d 62, 68-69 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine v. Superior Court, supra*, 68 Cal.2d 375, 383.) The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. (*People v. Salas* (1972) 7 Cal.3d 812, 818 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].)

■ Each of the aforementioned factors supported denial of the motion. Although the Golden Dragon massacre was an incident of the utmost gravity, defendant's involvement in it was peripheral, limited to disposing of the murder weapons. The only showing made by defendant as to the nature and extent of the news coverage was a single newspaper article concerning the conviction of Melvin Yu, which mentioned—in the 22d paragraph—that defendant was awaiting trial on the instant charges. Indeed, defendant was not tried in San Francisco, where the murders occurred, but in San Mateo County, where the murder weapons were disposed of. San Mateo is a populous metropolitan county. Defendant was apparently a stranger to that community, but no more so than were the victims. Moreover, examination of the voir dire clearly reveals pretrial publicity had no prejudicial effect. (See *Murphy v. Florida* (1975) 421 U.S. 794, 800-802 [44 L.Ed.2d 589, 594-596, 95 S.Ct. 2031]; *People v. Sommerhalder* (1973) 9 Cal.3d 290, 303-304 [107 Cal.Rptr. 289, 508 P.2d 289].) The motion for change of venue was properly denied.

■ Having qualified as an expert on Chinese youth gangs in San Francisco, Officer Simmons testified that defendant, like the principals in the Golden Dragon killings, was in his opinion a member of the Joe Boys gang. The stated purpose of this evidence was to prove that defendant had a motive to conceal the murder weapons—to help fellow gang members escape justice. Defendant's contention on this point is cap-

tioned: "Officer Simmons was improperly qualified as an expert on Chinese gangs." However, defendant's real quarrel is not with the officer's qualifications as an expert witness. Rather, relying on *In re Wing Y.* (1977) 67 Cal.App.3d 69 [136 Cal.Rptr. 390], defendant argues that Officer Simmons' testimony concerning defendant's membership in the Joe Boys gang should have been excluded on the ground it was based on inadmissible hearsay.

In *Wing Y.*, in an attempt to impeach the credibility of the defendant's alibi witnesses by showing bias, the People called a police officer who testified that the defendant and his alibi witnesses were reputed in the Chinatown community of Los Angeles to be members of the Wah Ching gang. The Court of Appeal held that the trial court erred in overruling the defendant's hearsay objection to this reputation evidence. "Officer Lou was competent to testify as to the membership in the Wah Ching gang of Lee, Tam and the minor Wing, but *only* from personal knowledge. Thus, Evidence Code section 702, subdivision (a), provides that, unless the matter pertains to the subject of expert testimony, 'the testimony of a witness concerning a particular matter is *inadmissible* unless he has *personal knowledge* of the matter. Against the objection of a party, such personal knowledge *must* be shown before the witness may testify concerning the matter.' (Italics added.)" (67 Cal.App.3d at p. 78.) Pointing out that experts may in certain circumstances give opinion testimony not based on personal knowledge (Evid. Code, § 801, subd. (b)), the People seek to distinguish *Wing Y.* on the ground that the police officer in that case, unlike Officer Simmons, did not testify as an expert witness. We need not resolve this question because defendant did not preserve the issue for appeal by a timely and specific objection in the trial court. (See Evid. Code, § 353; *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].) On cross-examination of Officer Simmons, defendant determined that his opinion that defendant was a Joe Boy was based in part on the ground that he had been so informed by admitted Joe Boys, including Chester Yu, Peter Cheung and Gan Wah Woo. At this point, under the theory he now advances, defendant should have moved to strike the relevant portion of Simmons' testimony on the ground it was based on inadmissible hearsay. This defendant failed to do.

■ Defendant contends the trial court unduly restricted his cross-examination of Chester Yu. Defendant sought to impeach Yu's credibility by demonstrating inconsistencies between his trial testimony and an earlier tape-recorded conversation with Officer McKenna. The jury was

permitted to listen to several portions of the recording, but not a portion assertedly dealing with Yu's movements after he disposed of the guns. Permission to play this passage was denied on the ground it was not inconsistent with Yu's testimony at trial. Whether the court erred in so ruling cannot be determined from the record on appeal. Prior to ruling, the court listened to the passage in question during a reported conference in chambers. However, defendant has not provided us with a transcript of that proceeding. The cassette tape recording containing the conversation between Yu and Officer McKenna has been lodged with this court. However, that exhibit, defendant's exhibit No. A, was never admitted into evidence, no motion to introduce it having been made. We cannot on this record conclude that the trial court erred.

 In a related contention, defendant complains he was not permitted to impeach Yu's credibility through the testimony of Frank Sheehan. Sheehan was called by the defense and asked to relate a conversation he had with Yu concerning the testimony Yu would give in defendant's case. Upon hearsay objection, defense counsel made an offer of proof—that Sheehan would testify that Yu said he "was being pressured by the District Attorney into testifying and that if he didn't testify he would get five years to life on each count." The People pointed out that the out-of-court statement was not admissible under the prior inconsistent statement exception to the hearsay rule because it was consistent with Yu's testimony concerning the plea bargain and his motivation for testifying, and that no other exception to the hearsay rule was applicable. Defense counsel conceded the statement was consistent with Yu's testimony. The objection was properly sustained. Moreover, any error was harmless for the very reason that Yu's prior statement was consistent with his present testimony. To the extent that his prior statement concerning his motivation in testifying would have impeached his credibility, he had already been impeached by his in-court admissions in that regard.

 Defendant contends the prosecutor committed prejudicial error by revealing to the jury, in the course of cross-examination, that defendant had refused to discuss the charges when questioned by police. The statement of which defendant complains was made under the following circumstances. On direct examination defense counsel asked Officer Fred Lau a number of questions concerning his having acted as an interpreter for Chester Yu when Yu was interviewed by the police. Counsel then asked Lau whether he had also interpreted for defendant. Lau responded affirmatively. Counsel next inquired whether defendant

had been released at the conclusion of the interview. Lau replied that he had been. Believing that counsel had created the false impression (1) that defendant had made a statement to the police on this occasion, and (2) that on the basis of this supposed statement the police had decided to release defendant, the prosecutor asked Lau: "Isn't it a fact that he refused to talk about the Golden Dragon incident whatsoever in that questioning?" Defense counsel objected, citing *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], which holds that comment upon a defendant's failure to testify is error. The objection was sustained. At the conclusion of the trial, the jury was instructed, in accordance with CALJIC No. 1.02, that a question is not evidence and may be considered only as it supplies meaning to an answer, and that as to any question to which an objection was sustained, they were not to speculate as to what the answer might have been or as to the reason for the objection. Any harm flowing from the alleged misconduct was thereby cured.

 Defendant contends the prosecutor also committed *Griffin* error in closing argument. Cliff Tam testified for the defense that he was working with defendant in a restaurant until midnight on Saturday, 3 September 1977. In argument the People merely pointed out that the defense had not produced alibi witnesses for the crucial period—the following day when the murder weapons were dumped into the bay. Defendant's objection was properly overruled. Although *Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, that rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (*People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959].)

Defendant's remaining assignments of prosecutorial misconduct during jury argument clearly lack merit, no objection having been made, in most instances, on the ground now urged on appeal.

 Relying on *In re Lewallen* (1979) 23 Cal.3d 274 [152 Cal. Rptr. 528, 590 P.2d 383], defendant contends the trial court penalized him for exercising his right to jury trial by imposing a more severe sentence than had been proffered during plea negotiations. Defendant was sentenced to two years in state prison—the middle term—on each of the two counts (§§ 18, 32, 12020), execution of sentence on the conviction of possessing a sawed-off shotgun being stayed pending appeal, the stay to become permanent upon completion of service of the sentence on

the accessory conviction. In an affidavit attached as an exhibit to the opening brief, counsel on appeal, who was also trial counsel, alleges that a superior court judge, not the judge who ultimately sentenced defendant, offered to let him plead guilty to one count on the understanding he would not be sentenced to prison. ▪ Matters not presented by the record cannot, of course, be considered on the suggestion of counsel in briefs or in affidavits attached thereto. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1086 [80 Cal.Rptr. 567, 458 P.2d 479]; *People* v. *Merriam* (1967) 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161].) ▪ Moreover, even if counsel's allegations were supported by the record, he still would not have stated a claim for relief under *Lewallen* for he admits the sentencing judge did not say anything reasonably giving rise to the inference that he was penalizing defendant for exercising his right to jury trial. The mere fact, if it be a fact, that following trial defendant received a more severe sentence than he was offered during plea negotiations does not in itself support the inference that he was penalized for exercising his constitutional rights.

Contrary to defendant's contention, there is no evidence in the record that the People were in the least dilatory in granting him discovery.

Defendant's remaining contentions, most of which involve recasting of contentions already discussed, similarly lack merit.

The judgment is affirmed.

Mosk, J., and Richardson, J., concurred.

NEWMAN, J.—I concur in the result. Yet once again, I believe, our court may have failed to observe California Rule of Court, rule 29(a), which advises that "hearing in the Supreme Court after decision by a Court of Appeal will be ordered...where it appears necessary to secure uniformity of decision or the settlement of important questions of law...."

As the majority here concede, the principal issue is whether under "familiar rules" there was sufficient corroboration of an accomplice's testimony. (*Ante*, p. 26.) To support the contention that a hearing in this court was necessary, petitioner argued as follows:[1]

[1]Quoted from page 2 of the petition for hearing filed here on May 30, 1980. (Italics added.)

"1. This is an important prosecution of substantial public interest. It involves the shooting at the Golden Dragon restaurant in San Francisco in the early morning hours of September 4, 1977 in which five people were killed and eleven wounded.

"2. The [Court of Appeal] opinion not only reversed the conviction but precluded the possibility of retrial.

"3. The opinion erroneously invaded the province of the jury by finding, contrary to the verdict of a unanimous jury of twelve impartial men and women, that there was insufficient evidence to corroborate accomplice testimony; this was done despite corroborating evidence showing motive, opportunity, knowledge and other circumstances indicating guilt.

"4. The opinion relied on a 'fact' which is not in the record, and which is false, in apparently finding an important item of corroborating evidence to be insignificant. The inhabitants of this state are entitled to have 'jury' verdicts, even those made by an appellate court, be based solely on evidence presented in the record, and not on facts the court somehow wills into being.

"5. *Even though the [Court of Appeal] opinion is not published*, hearing should be granted to deter similar overreaching by intermediate appellate courts in the future."

I submit that those five claims, even if presumed correct, show a necessity neither to secure "uniformity of decision" nor to settle "important questions of law." (Cf. my separate opinions in *People* v. *Superior Court (Wells)* (1980) 27 Cal.3d 670, 674 [165 Cal.Rptr. 872, 612 P.2d 962], and *People* v. *Brigham* (1979) 25 Cal.3d 283, 316 [157 Cal.Rptr. 905, 599 P.2d 100].)

**BIRD, C. J.**—I respectfully dissent.

In their concern to punish those responsible for the notorious Golden Dragon shootings, the majority forget the important policies behind the rule requiring corroboration of accomplice testimony. (Pen. Code, § 1111.) As a result, they jerry-build independent corroboration for accomplice testimony and by implication let stand a ruling that a person may be qualified as an expert and testify as an expert on the credibility of hearsay declarants.

In my dissenting opinion in *In re Mitchell P.*, I discussed the untrustworthy nature of accomplice testimony and the problems it poses to the accuracy of a verdict. (See *In re Mitchell P.* (1978) 22 Cal.3d 946, 954-956 [151 Cal.Rptr. 330, 587 P.2d 1144] (dis. opn. of Bird, C. J.).) The Legislature acknowledged these dangers when it passed Penal Code section 1111. Under that statute, uncorroborated accomplice testimony can *never* establish guilt beyond a reasonable doubt. This case presents a textbook example of the dangers that Penal Code section 1111 was promulgated to prevent.

The primary witness against appellant was Chester Yu, who had admittedly helped to dispose of the murder weapons. This made him an accomplice as a matter of law. Yu apparently had not only the inducement of lenient treatment to motivate his testimony, but also the hope of protecting his brother Tom Yu, described by one police officer at trial as the "ringleader" of the Joe Boys gang. There was evidence at appellant's trial that it was Tom Yu himself who had removed the murder weapons from the Rodriguez' house. Subsequently, Tom Yu was convicted by a jury of first degree murder in connection with the Golden Dragon killings. Nevertheless, Chester Yu testified that his brother had nothing to do with the planning, commission, or concealment of the shootings.

In an unanimous opinion, the Court of Appeal carefully analyzed the evidence with which the prosecution purported to corroborate Chester Yu's accomplice testimony. It concluded that there was insufficient evidence to support the verdict. I agree.

However, there is an additional issue which the Court of Appeal did not reach. In purporting to find independent evidence that appellant harbored a motive to avenge the recent slaying of Joe Boy Felix Huie by rival gangs, the majority rely on the testimony of Officer Timothy Simmons that credible sources told him that appellant was a member of the Joe Boys gang. (Maj. opn., *ante*, at p. 28.) The majority refuses to address appellant's argument that Officer Simmons' testimony regarding this assertedly expert opinion should have been excluded because it was based on inadmissible hearsay. The majority conclude that the issue was not preserved by an adequate objection below. (Maj. opn., *ante*, at pp. 31-32.) However, the record demonstrates that this conclusion is unwarranted.

At trial, the prosecutor moved to qualify Officer Simmons as an expert on Chinese youth gangs in San Francisco for the express purpose of "offering the opinion of qualified experts [*sic*] that this defendant is a member, has been a member of the Joe Boys." Defense counsel then asked Officer Simmons about the informants whom the officer had identified as the source of some of his information concerning gang membership. The prosecutor objected to the disclosure of the informants' identities, and defense counsel responded, "I ask that he not be allowed to testify because we're denied the right to cross-examine these people who might give information which can be pushed into this trial...." The prosecutor argued that the officer "would be testifying as an expert, who is entitled to rely on hearsay, as many experts are, without disclosing the names of the informants." The court accepted the prosecutor's claim of privilege.

Defense counsel then sought to identify the other bases of Simmons' purported expertise, and the officer informed him that the "bulk" of it was "based on dealing on a one-to-one basis with many individuals, associates, gang members, of all the different youth gangs in San Francisco." At that point, defense counsel explained to the court, "That is what my objection is based on, as to this man's expertise. Any expertise, at least the bulk of it, is based on talk where we cannot cross-examine anybody. I think it's a Sixth Amendment issue and I don't think an expert should be allowed to come in and say things which we cannot possibly attack. I don't know what he's going to say. He can say anything that anybody may have said to him. There's nothing we can do about it."

The district attorney replied, "The Evidence Code itself states quite clearly that an expert may rely in part on hearsay to form his opinion, if such would be a proper basis for his opinion, and clearly for a person to be an investigator in this—an expert in this kind of area, he would have to rely, in part, upon hearsay...."

The court then overruled defense counsel's objection: "We'll instruct the jury that the opinions of an expert are the evidence, the reasons for the opinion, that he will be questioned about isn't the evidence. It's the reason for the evidence, mainly, his opinion. It strikes the Court that your objection goes to the weight rather than the admissibility, Mr. Suman [defense counsel], so it's overruled."

The above-quoted colloquies demonstrate that defense counsel did object to the hearsay nature of the information on which Officer Simmons based his "expert" opinion that the accused was a Joe Boy. The prosecutor understood this objection and argued in reply that hearsay was an appropriate basis for Officer Simmons' "expert" opinion. The trial court also understood the nature of the objection and overruled it on the ground that the hearsay bases of the officer's opinion went to its weight rather than its admissibility. Since the prosecutor had every "opportunity to cure the defect at trial," the accused is entitled to have this court address the merits of his contention. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; see also Evid. Code, § 353.)

Ordinarily, witnesses may not testify in the form of an opinion unless the opinion is "[r]ationally based on the perception of the witness." (Evid. Code, § 800, subd. (a).) However, in certain circumstances an expert witness may testify to an opinion which is not based exclusively on the expert's own perceptions. To be admissible, such opinion testimony must, inter alia, be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Officer Simmons' opinion about appellant's gang membership failed to clear even this initial hurdle. In the Evidence Benchbook, section 29.4, the requirement imposed by Evidence Code section 801, subdivision (a) is discussed. It is pointed out that this Evidence Code section does not mean that an expert's opinion is rendered admissible because a subject matter is beyond the realm of common experience. "[T]he proferred opinion may [still] be one that would not assist the trier of fact, because the trier of fact may be able to draw a conclusion from the facts testified to as easily and as intelligently as the expert may." (Jefferson, Cal. Evidence Benchbook (1972) § 29.4, p. 506.)

In the present case, aside from the otherwise inadmissible hearsay opinions of other alleged Joe Boys, the only facts on which the officer's opinion was based were (1) the hearsay information that other police officers—conducting surveillance unrelated to the Golden Dragon incident—had on one occasion observed the accused in the company of "other Joe Boys" in Oakland and had on another occasion seen him with an alleged Joe Boy in Sacramento, and (2) Officer Simmons' sighting of appellant at the funeral of Felix Huie.[1]

---

[1]On cross-examination, Officer Simmons admitted that he had attended the funerals

Even though the subject of Chinese youth gangs is generally beyond the common ken, the jury in the present case was in as good a position as Officer Simmons to draw from the information about appellant's past associations an inference that he was a Joe Boy. Officer Simmons' belief that such an inference was a compelling one was scarcely the sort of expertise that would "assist the trier of fact" as Evidence Code section 801, subdivision (a) requires. Similarly, if the prosecutor had called to the stand the various hearsay declarants on whom Simmons relied, and asked them their opinions—based on their personal perceptions—of appellant's gang membership, Officer Simmons would be no better situated than the jury to evaluate the credibility of such opinions. Since the drawing of possible inferences from facts and the assessment of witnesses' credibility are within the exclusive province of the finder of fact, the jury is in an eminently superior position to undertake those functions.

The prosecutor should not be permitted to launder inadmissible hearsay into admissible evidence or accomplice testimony into independent corroboration by the simple expedient of passing it through the conduit of purportedly "expert" opinion. Appellant's objection at trial to admitting Officer Simmons' opinion that appellant was a Joe Boy should have been sustained. Clearly, there was not sufficient evidence offered to corroborate Chester Yu's testimony. The following portions of the Court of Appeal's unanimous opinion establish this most strikingly.*

The principal prosecution witness at trial was Chester Yu. Yu had driven the three killers (members of the Joe Boys gang) to the Golden Dragon Restaurant from the residence of a Mr. and Mrs. Rodriguez in Pacifica[1] in the early morning hours of September 4, 1977, and had driven the "getaway" car after the homicides back to the Rodriguez house. The weapons were placed in a hall closet in the house.

Yu testified, in substance, as follows. Some time later that same morning, appellant came by car to the Rodriguez house, bringing food

---

of "seven or eight" Joe Boys but had seen appellant at only one of them, and that many persons attended Felix Huie's funeral who had no affiliation with the Joe Boys.

*Brackets together, in this manner [], are used to indicate deletions from the body of the Court of Appeal's opinion. Brackets enclosing material (other than editor's added parallel citations) are used to denote this writer's additions. (See *People* v. *Cantrell* (1973) 8 Cal.3d 672, 677 [105 Cal.Rptr. 792, 504 P.2d 1256].)

[1]It appears that the Rodriguez residence had been a "hangout" for members of the Joe Boys gang.

for the killers. Subsequently, appellant took the guns used in the killing and put them into the trunk of his car. One of the killers told appellant to dispose of the weapons in San Francisco Bay. Appellant drove his car, with Yu as a passenger, to a road running adjacent to the Bay, between the San Francisco Airport and the Kee Joons Restaurant in Burlingame, and threw the firearms into the Bay at a point close to and in sight of the restaurant. Yu subsequently led the police to the location and the weapons.

Mrs. Rodriguez testified that appellant had come to her house in the morning of September 4, 1977, bringing some food. There was an indeterminate number of young Chinese present. She testified further that she and her husband left the house soon after appellant arrived and returned that night. Finally, she testified that she knew that there had been firearms in her house but she did not know who had taken them away or when.[2]

Mr. Rodriguez testified that on the morning of September 4, 1977, a Chinese brought some food to his house. At the time there was a "bunch" of Chinese present, more than the four involved in the killings, but how many was not specified. Appellant looked similar to the person who brought the food but he wasn't sure. The weapons in question had been in the hall closet of his home for about a month before September 4. Shortly after the Chinese had arrived, bringing food, he and his wife left and didn't return until 9 or 10 that evening. At the time he left, to the best of his knowledge,[3] the weapons were still in his closet but when he returned that evening, they were gone.

There is evidence that appellant was a member of the Joe Boys gang or at least closely associated with members of the gang.

Finally, there is undisputed evidence that appellant worked at the Kee Joons Restaurant for some three weeks ending approximately three months before September 4, 1977.

Appellant did not testify.

---

[2]There was evidence that Mrs. Rodriguez, under police questioning, said that Tom Yu, brother of Chester Yu, had taken the guns from her house two or three weeks after the killings.

[3]Rodriguez did not testify as to when he had last actually seen the weapons in his closet.

## Was Appellant Convicted on the Uncorroborated Testimony of an Accomplice?

The trial court correctly ruled that as a matter of law Chester Yu was an accomplice of appellant and appropriately instructed the jury on the principles relating to the testimony of an accomplice, including an instruction as to the sufficiency of evidence to corroborate an accomplice.

Penal Code section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The reason for the above provision is stated by *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 967 [127 Cal.Rptr. 135, 544 P.2d 1335]: "Accomplice testimony is suspect because, like hearsay, it too may be unreliable. '[E]xperience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity.' (*People* v. *Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734]; see also *People* v. *McRae* (1947) 31 Cal.2d 184, 186 [187 P.2d 741]; *People* v. *Dail* (1943) 22 Cal.2d 642, 654 [140 P.2d 828]; *People* v. *Coffey* (1911) 161 Cal. 433, 438 [119 P. 901]; 7 Wigmore on Evidence (3d ed.) § 2057, pp. 322-325.) In addition to being derived from a suspect source accomplice testimony is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate its credibility. '"[A]n accomplice is not merely a witness with a possible motive to tell lies about an innocent accused but is such a witness peculiarly equipped, by reason of his inside knowledge of the crime, to convince the unwary that his lies are the truth."' (Heydon, *The Corroboration of Accomplices* (Eng. ed. 1973) Crim.L.Rev. 264, 266; see also Note, 54 Colum.L.Rev. 219, 234.)" See also *People* v. *Robinson* (1964) 61 Cal.2d 373, 404, footnote 25 [38 Cal.Rptr. 890, 392 P.2d 970]: "The need for the statutory requirement has been expressed as a check against the possibility that one confessedly guilty of a crime may implicate another for the sole purpose of gaining leniency."

The statute is interpreted as follows: "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense[] charged. [Citations.]." (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556].) The corroborative evidence may be "slight and entitled, when standing by itself, to but little consideration." (*People* v. *McLean* (1890) 84 Cal. 480, 482 [24 P. 32].) The above principles are quoted in *People* v. *Hathcock* (1973) 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476]; *People* v. *Perry* (1972) 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Luker* (1965) 63 Cal.2d 464, 469 [47 Cal.Rptr. 209, 407 P.2d 9]; *People* v. *Holford* (1965) 63 Cal. 2d 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423]; see *People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116]. However, the evidence is not sufficient if "it merely casts a grave suspicion [up]on the accused." (*People* v. *Robbins* (1915) 171 Cal. 466, 470; quoted in *People* v. *Robinson* (1964) 61 Cal.2d 373, 399 [38 Cal.Rptr. 890, 392 P.2d 970]; and *People* v. *Luker, supra*, 63 Cal.2d at p. 469, fn. 2.) "Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant." (*People* v. *Santo* (1954) 43 Cal.2d 319, 327; quoted in *People* v. *Perry, supra*, 7 Cal.3d at p. 769.)

The standard of review is that "Unless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably *tend* to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*Id.*, at p. 774.)

The only testimony that directly implicates appellant is the testimony of Chester Yu. Yu had been promised and had received leniency.[4] In addition, it appears that Chester Yu may have been "covering up" for his brother Tom.[5]

---

[4]By his own testimony, he had conspired to commit murder and had been an aider and abettor of the murders. He was permitted to plead to lesser charges in juvenile court (he was 17 years old) and was committed to the Youth Authority.

[5]Tom Yu was present at the Rodriguez house both immediately before and after the

In the language of *People* v. *Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734], Chester Yu's testimony "should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity." Here, leniency was not a "hope or expectation"; it was an accomplished fact.

Respondent asserts that sufficient corroboration of Chester Yu's testimony consists of the following evidence, that: 1. Appellant was a Joe Boy or at least an associate member of the Joe Boys gang.

2. He was in the Rodriguez house the morning following the homicides with the killers.

3. The weapons had been in the Rodriguez home for a month before the homicides but were not there the evening following the homicides.

4. Appellant had worked at the Kee Joons Restaurant and the weapons were found in the Bay near the restaurant.

5. Chester Yu knew where the guns had been disposed of.

Evidence that appellant knew Yu or the killers, was a member of the Joe Boys, and was with the killers in the Rodriguez house is not sufficient corroboration for the "evidence independent of the testimony of the accomplice must tend to connect a defendant with the crime itself [and not simply with its perpetrators]." (*People* v. *Reingold* (1948) 87 Cal.App.2d 382, 400 [197 P.2d 175]; *People* v. *Robinson, supra*, 61 Cal.2d 373, 400; *People* v. *Hathcock, supra*, 8 Cal.3d 599, 618.)

The act that constituted the crime was aiding the killers by disposing of the fatal weapons with the intent that the killers avoid or escape arrest, trial or conviction. Neither membership in the gang nor presence along with others at the Rodriguez house that fatal morning, nor both, are evidence that connect appellant with the crime itself.

As to the weapons in the Rodriguez house, Mr. Rodriguez testified that "to the best of his knowledge" the weapons were in the hall closet

homicides. Chester Yu testified that Tom had no part in the planning or commission of the killings. We take judicial notice that Tom has been convicted of first degree murder in connection with the Golden Dragon killings.

We have already noted that Mrs. Rodriguez had told the police that it was Tom Yu who had taken the weapons away.

when he left that morning, after having been there a month. But there is no evidence as to when, in fact, he last saw the weapons. According to Yu's testimony, the weapons had been taken from the closet in the early morning and put back, this without the knowledge of Rodriguez. The only evidence that the weapons were in the house that morning after the murders is Yu's testimony.

The weapons were found in the Bay not far from a restaurant where appellant had worked for some three weeks about three months before the events in question. But the roadway is not some isolated, private road that would be known to a few, it is a public road connecting the San Francisco Airport with a number of business establishments.[6]

Finally, the fact that Yu led the police to the place where the weapons had been discarded certainly corroborates Yu's testimony that he was present when the weapons were thrown into the Bay; it does not tend to show that *appellant* was present.

In sum, the corroborating evidence shows that appellant was a member of the Joe Boys and was present at the Rodriguez house with the killers and others of the gang some hours *after* the killing.

We have considered the matter and are of the opinion that while the corroborating evidence cast some suspicion upon appellant, it does not reasonably tend to connect appellant with the commission of the crime.

What we have said with regard to the conviction for being an accessory applies equally to the conviction on the charge of possessing a sawed-off shotgun.

[The judgment on each count should be reversed. Since a reversal would be based on the insufficiency of the evidence, the case should be dismissed and the trial court should be directed to do so. (*Burks* v. *United States* (1978) 437 U.S. 1, 18 [57 L.Ed.2d 1, 14, 98 S.Ct. 2141]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 209-210 [155 Cal.Rptr. 657, 595 P.2d 91].)]

Tobriner, J., concurred.

Appellant's petition for a rehearing was denied March 20, 1981. Bird, C. J., and Tobriner, J., were of the opinion that the petition should be granted.

---

[6]In fact, the weapons were found in an area closer to a Chinese-owned warehouse than to the restaurant.