Filed 3/5/26  P. v. Washington CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B330868 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA489335 |
| RODERICK NATHANIEL WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne, Shezad H. Thakor, and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

A jury convicted Roderick Washington of many counts based on credit card fraud and unemployment insurance fraud. Washington appeals the judgment on several grounds. We grant his request to review the court's determinations pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). We affirm. Statutory citations are to the Penal Code.

I

Washington committed two types of fraud.

A

Washington's first type of fraud involved credit cards.

Police found evidence of this fraud when they searched the house of Antonia Harrison, Washington's girlfriend. Washington had been staying with Harrison. In Harrison's house, officers found hundreds of credit profiles, including lists of personal identifying information, mail addressed to Washington, licenses and credit cards in other people's names, and forged police and fraud reports.

Police also searched Washington's daughter's residence. There they found debit cards in other people's names, including names they had seen among Washington's belongings.

Investigation revealed Washington had opened accounts in the name of other people, including dead ones. After opening these accounts, he would claim there was fraudulent activity on the account in order to avoid paying the debt on that account. The company or bank would then provide a new account, which Washington would also fail to pay off. Washington caused just under half a million dollars in loss to bank and credit card company Synchrony Financial. Law enforcement and investigators for Synchrony confirmed Washington had information about 90 Synchrony accounts.

2

Washington also perpetrated fraud against Wells Fargo, using other people's personal information to open accounts and to get cash advances. Video captured Washington getting money using multiple identities. One witness whose information Washington used testified at trial that he had never opened such an account, was not the person in the surveillance video, and had never given Washington permission to use his information.

B

The second type of fraud Washington committed involved California's Employment Development Department, which runs the state's unemployment and disability insurance program. The Department relaxed standards during the covid pandemic to address the sudden increased need. After getting through the crisis period, the Department began investigating a series of applications for unemployment benefits all sent from the same IP address. The Department discovered this IP address was associated with Washington's residence. The Department issued $524,368 in connection with applications Washington and his associates submitted, although only $154,434.68 remained in the accounts. Several of the applications used addresses connected with Washington or his associates. Will Harrison, Washington's girlfriend's son, helped Washington with the scheme. So did Melissa Washington, Washington's daughter.

C

Police arrested Washington for charges relating to credit card fraud. While he was in jail, police monitored Washington's phone calls. His calls, including ones to Will Harrison and Melissa Washington, revealed that Washington was continuing to orchestrate the unemployment insurance fraud scheme from prison. He gave instructions to his associates to ensure the

applications continued to be submitted and processed and the issued debit cards claimed.

In his first fraud case, Washington elected, and the court allowed him, to represent himself on October 16, 2020. On November 30, 2020, Washington appeared in court represented by private counsel. In January 2021, Washington's counsel moved to be relieved due to counsel's illness. The court then granted Washington's renewed motion to represent himself.

A new information charged Washington with unemployment insurance fraud. Washington represented himself in this case as well, filing a number of motions. Pursuant to Washington's *Pitchess* motion, the court granted an in-camera review of the records of two peace officers involved in the search of Harrison's house.

The prosecutor moved to consolidate the cases on May 13, 2021. At the May 27, 2021 hearing, Washington said he did not oppose consolidation, and the court granted the motion. Washington told the court he was thinking about giving up his pro per rights in the case. The prosecutor filed an amended consolidated information later that day.

On June 10, 2021, the court told Washington it had found nothing discoverable in the peace officers' personnel records. At the same hearing, Washington waived his pro per status and accepted representation by counsel.

On March 21, 2022, Washington sought to represent himself again. The court denied his request.

On January 13, 2023, the trial court denied Washington's request to change counsel after a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.

4

On April 19, 2023, the court again denied Washington's request to represent himself.

D

The jury convicted Washington of: (1) two counts of theft by false pretenses in violation of section 532, subdivision (a); (2) one count of possession of a forged driver's license in violation of section 470(b); (3) two counts of possession of multiple person's personal identifying information with intent to defraud in violation of section 530.5, subdivision (c)(3); (4) one count of preparing false documentary evidence in violation of section 134; (5) three counts of unlawful transfer of personal identifying information in violation of section 530.5, subdivision (d)(1); (6) four counts of possession of personal identifying information with intent to defraud in violation of section 530.5, subdivision (c)(2); and (7) 33 counts of unemployment insurance fraud in violation of Unemployment Insurance Code section 2101, subdivision (a). With regard to the unemployment insurance fraud counts, the jury found the loss from the offenses exceeded $500,000 and, after a bifurcated trial, there existed factors in aggravation.

The trial court sentenced Washington to three years on the unemployment insurance fraud count and a consecutive five years for the loss enhancement. The court sentenced Washington to consecutive eight-month terms on the other 32 unemployment insurance fraud counts and 11 of the other counts. In total, the court sentenced Washington to 36 years and eight months in prison.

Washington appealed.

II

Washington raises four complaints. First, he argues the trial court erred by imposing consecutive rather than concurrent

5

sentences for his unemployment insurance fraud convictions. Second, he claims the trial court should have granted his requests to represent himself in March 2022 and April 2023.  Third, he raises an issue about the trial court's *Pitchess* determination.  Finally, he argues his 33 convictions for insurance fraud should be consolidated into a single conviction.  We hold his first, second, and fourth contentions lack merit.  With the concession of the prosecutor, we have reviewed the trial court's *Pitchess* motion.  We hold the court did not err.

A

We turn first to Washington's argument that the trial court abused its discretion by imposing consecutive instead of concurrent sentences for his 33 convictions of unemployment insurance fraud.  This argument is incorrect.

Trial courts have wide discretion to determine whether a defendant's sentences should be consecutive.  (§ 669, subd. (a); *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1182.)  Various rules promulgated by the Judicial Council guide these choices, including the California Rules of Court.  Rule 4.425 lays out certain factors courts should consider in making the decision. (*People v. Scott* (1994) 9 Cal.4th 331, 349.)  Our review of such a determination is deferential.  (*People v. Bradford* (1976) 17 Cal.3d 8, 20.)

Rule 4.425 identifies an aggravating factor found true by the jury as a basis for imposing consecutive sentences.  Here, the court identified the fact that the jury found true the aggravating factor that Washington was on probation at the time he committed these crimes.  This was a basis for the consecutive sentences.  In accordance with Rule 4.425, the trial court did not use this circumstance to impose the upper term or otherwise

6

enhance the sentence. Rather, it found this aggravating circumstance outweighed the mitigating circumstances. This was proper.

Washington argues the insurance fraud claims can be viewed as a single victim crime over a short period, which supports concurrent sentencing. However, as discussed below, the unemployment insurance fraud claims can also be considered multiple crimes. And while they did all involve the Department as a victim, they also involved each individual whose identity Washington used to make these false claims. The court did not abuse its discretion.

Washington highlights that the statutory provision allowing an enhancement for related felonies based on the amount of money involved provides a sentencing triad of two, three, or five years. These relatively low numbers, Washington argues, means the imposition of consecutive sentences is improper. This argument is invalid. A lone instance of financial fraud may be relatively minor in the panoply of crime. Culpability soars, however, when a criminal industrializes the process.

Washington argues consecutive sentences are the most draconian sanction and therefore improper here. The trial court was entitled, however, to consider the magnitude of Washington's crimes and his failure to respond to the deterrent effect his past sentences were designed to impose.

Washington argues that the fact that the prosecutor offered a plea bargain of probation before trial demonstrates the sentence is the product of judicial vindictiveness and therefore inappropriate. This is inaccurate. While a disparity between an imposed sentence and a proffered plea bargain can be a sign that

the court punished the defendant for exercising a right to trial, it alone is insufficient. "The mere fact, if it be a fact, that following trial defendant received a more severe sentence than he was offered during plea negotiations does not in itself support the inference that he was penalized for exercising his constitutional rights." (*People v. Szeto* (1981) 29 Cal.3d 20, 34–35. Washington identifies no other signs the trial court was punishing him for exercising his right to a trial.

The trial court did not abuse its discretion in imposing consecutive sentences.

B

Washington next challenges the trial court's denial of his right to represent himself in March 2022 and April 2023.

The Sixth Amendment guarantees a criminal defendant two mutually exclusive rights: the right to counsel and the right to represent oneself. (*People v. Boyce* (2014) 59 Cal.4th 672, 703 (*Boyce*).) We indulge all inferences against the defendant's waiver of the right to counsel. (*Ibid.*) To invoke the right to self representation, the defendant must do so unequivocally, knowingly, and in a timely fashion. (*People v. Wright* (2021) 12 Cal.5th 419, 435–436.) Where the defendant meets these criteria, the court has no discretion to deny the request. (*Ibid.*) That a defendant knows little of the law or will do a poor job is not a reason to deny the request. (*People v. Butler* (2009) 47 Cal.4th 814, 827.) Neither is a defendant's lack of access to the law library or phone. (*Ibid.*)

However, the right to self-representation is not absolute. (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*).) A trial court may deny such a request where it is untimely under the circumstances or the waiver is not knowing and intelligent.

8

(*People v. Best* (2020) 49 Cal.App.5th 747, 763 (*Best*); *People v. Stanley* (2006) 39 Cal.4th 913, 929 [request for self-representation properly denied where waiver not knowing and intelligent].) A court may also deny such a request where it is made for an improper reason, such as delaying the trial, or where the defendant's conduct threatens the integrity of the trial. (*Lynch*, *supra*, 50 Cal.4th at pp. 721–722; *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1515–1516 (*Kirvin*).)

We review the entire record to determine (1) if a defendant made a genuine request for self-representation and (2) whether the trial court's decision was proper. (*Best*, *supra*, 49 Cal.App.5th at p. 756.) If the court based its denial of a request on an improper basis, but the record reveals a proper basis, we will affirm. (*Boyce*, *supra*, 59 Cal.4th at p. 703.) We defer to the court's determination of whether a defendant's conduct is so disruptive, disobedient, disrespectful, or obstructionist that self-representation would threaten the integrity of the trial. (*Best*, *supra*, 49 Cal.App.5th at p. 761; *People v. Welch* (1999) 20 Cal.4th 701, 735 (*Welch*) [trial court in best position to judge defendant's conduct].)

We turn now to the first denial Washington challenges. During a hearing in March 2022, Washington's counsel expressed to the court that Washington was confused about his pro per status and that, despite counsel's explanations, he believed he was still pro per on his insurance fraud case. The court reiterated what counsel had told Washington, reminding him the two cases had been consolidated, so he was represented with regard to all of the charges. Washington objected, claiming he was not told he had to give up his pro per status on the other case and that he did not receive notice that the cases had been

9

consolidated. Washington then requested to go pro per again. The court denied the request, noting that Washington was "wanting to be pro per on some things and not on other things."

Washington's pattern of vacillation supported the trial court's decision. (*People v. Gomez* (2018) 6 Cal.5th 243, 271–272 [trial court did not err in denying a *Faretta* request where defendant engaged in a pattern of vacillation that over time could harm the progress of the trial].) He vacillated between wanting to represent himself and wanting counsel. This was apparent not only in his flip-flopping requests for counsel and to represent himself, but also his conduct of acting as his own lawyer even when represented.

On October 16, 2020, Washington requested and the court allowed him to go pro per. On November 20, 2020, Washington appeared represented by private counsel. In January 2021, when the court relieved counsel due to illness, the court granted Washington's renewed request to represent himself. Washington represented himself on his original and his new fraud case.

In May 2021, the court consolidated the cases, which Washington explicitly declined to oppose. Washington told the court he was thinking of giving up his right to be pro per. At the June 10, 2021 hearing, Washington waived his pro per status and accepted representation. About nine months later, Washington sought to represent himself again in March 2022. In denying the request, the court noted Washington improperly filed and argued even when represented by counsel.

The court did not abuse its discretion by denying Washington's March 2022 request.

We turn next to the denial of Washington's April 2023 request. At a pretrial hearing where the case was 0 out of 15,

10

Washington again asked to go pro per. The trial court again denied the request:

"The Court: Well, that request is denied. And here's why: Mr. Washington has placed himself in a position where he has no opportunity to go to the library, to use the telephone. And this court – he's also been somewhat – strike that. He's also disregarded this court's rulings.

"And in terms of various writs that he's filed alongside his counsel, this court has repeatedly ruled, and he's been provided copies of these rulings.

"And he cannot represent himself alongside counsel. He disregards the rules of not only this court but also of the other institutional individuals that he's come in contact with.

"And I think that, number one, is because of his custody status, he has – will not have the ability to adequately represent himself.

"Number 2, this court knows from past experience with Mr. Washington when he was pro per, that he cannot follow the court's directions. And also this case is very old. We're 0 out of 15 for trial.

"This court believes that, if I were to allow him to go pro per, this case would just drag on and on and on. He would focus on the issues that have already been resolved by this court, such as the issue of the search warrant, the motions that were previously heard to traverse, to –"

"Washington: No. Excuse Me. I'd like to say something."

"The Court: No, you may not. You're represented by counsel.

"This is another reason. He interrupts. If he's pro per, he interrupts more.

"I know he believes that this court did not ever rule on that issue, but it did. There's a minute order in the file indicating the court ruled.

"He does not believe that the court has provided him with a copy of the original, unredacted search warrant, but it did. This court provided that to him, either directly or through his counsel.

"We had allowed him to have an additional 1538.5, even though he had one at the lower court.

"And yet he's still not satisfied. He will focus on that, and he will never prepare himself or be able to prepare himself to go to trial.

"So his request to be pro per is denied."

Washington correctly argues, and the prosecutor concedes, that the trial court was wrong to base its decision on Washington's inability to access the law library and telephone. However, the other reasons described by the court provide a proper basis for the denial. (*Boyce*, *supra*, 59 Cal.4th at p. 703.)

The trial court noted Washington's repeated and demonstrated inability to follow the court's rules. (*Welch*, *supra*, 20 Cal.4th at p. 734 [court may properly deny request for self-representation where defendant's conduct gives court reason to believe it will create disruption].) The court cited Washington's continued improper filings and unwillingness to stop litigating issues already decided by the court. (*Kirvin*, *supra*, 231 Cal.App.4th at p. 1516 [court did not abuse discretion in finding defendant's repeated refusal to come to court and obey court orders would threaten integrity of trial].) The court noted it had provided additional proceedings to mollify Washington, but Washington still refused to accept the rulings. The court noted Washington's improper interruptions of the proceedings and that

12

these interruptions increased when Washington was representing himself.

The trial court further noted allowing Washington to go pro per at this stage would likely delay the proceedings, which had already taken a few years. The court's citation to Washington's continued relitigation of issues would slow the case's progress. Given the court's experience with Washington, it had a basis for this determination.

Neither the trial court's denial of Washington's request in March 2022 nor in April 2023 was an abuse of discretion.

C

The prosecutor did not oppose Washington's request that we independently review the trial court's determination at the in-camera review of the peace officer records pursuant to *Pitchess*. We have done so. The trial court's ruling was proper.

D

Washington argues the trial court erred by failing to consolidate his 33 convictions for unemployment insurance fraud into a single violation. This argument is in error.

While acknowledging that *People v. Whitmer* is against him, Washington argues we should instead apply *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*). In *Bailey*, the defendant submitted a fraudulent welfare application. (*Id.* at pp. 515–516.) The defendant then collected several welfare payments, each under the monetary limit for grand theft. (*Id.* at p. 518.) The Supreme Court approved aggregating the thefts into one felony charge of grand theft because the acts were carried out as part of a single plan. (*Id.* at pp. 519–520.)

13

From *Bailey* arose the doctrine of disallowing the charging of multiple counts where the acts were part of one overarching plan. (*Kirvin*, *supra*, 231 Cal.App.4th at p. 1518.)

About four decades later, the Supreme Court revisited the *Bailey* doctrine in *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*). In *Whitmer*, the defendant embezzled money from his motorcycle dealer employer by submitting fictitious applications for purchases. (*Id*. at p. 735.) The defendant argued he could only be charged with a single felony under *Bailey* because he completed each theft in the same way. (*Id*. at p. 736.) The Supreme Court disagreed. (*Id*. at pp. 740–741.)

The court held *Bailey* was limited to its facts and whether acts of misconduct should be aggregated or not depended on the facts of the case. (*Whitmer*, *supra*, 59 Cal.4th at p. 740–741.) The Supreme Court noted that, while the defendant's conduct was similar, he had to fill out separate paperwork for each application and in general used a different fictitious buyer for each. (*Id*. at p. 735.) Each count of grand theft was therefore based on a separate and distinct act. (*Id*. at p. 736.) In such circumstances, the misconduct could properly be charged as separate felonies. (*Id*. at pp. 740–741.) To find otherwise would provide a "felony discount" to the most prolific thieves. (*Id*. at p. 739.) However, in recognition of the fact that the courts of appeal had applied *Bailey* differently, the Supreme Court ruled it would not be fair to apply it retroactively to Whitmer. (*Id*. at p. 735, 742.)

Washington argues *Bailey* should still apply because it was the law when the legislature enacted the current punishment provision for unemployment insurance fraud. The *Whitmer* court rejected this argument. (*Whitmer*, *supra*, 59 Cal.4th at pp. 741–

14

742.)  The court noted that sometimes legislative inaction without more does not signify approval.  (*Ibid*.)  This was especially true because *Whitmer* was not incompatible with *Bailey* and the cases it distinguished.  (*Ibid*.)  Thus, though *Whitmer* could not be applied retroactively, it is appropriate to apply it to misconduct occurring after the court decided *Whitmer*, like Washington's acts here.

**DISPOSITION**

We affirm.


WILEY, J.


We concur:


STRATTON, P. J.


SCHERB, J.


15