Filed 12/9/14  P. v. Sherrors CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064171 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD148429) |
| RONNIE JERMAINE SHERRORS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

After a retrial, a jury convicted Ronnie Jermaine Sherrors of first degree murder (Pen. Code,[1] § 187, subd. (a)).  The jury also found that Sherrors committed the crime during the commission of a robbery (§ 190.2, subd. (a)(17)).  The court sentenced Sherrors to prison for life without the possibility of parole.

Sherrors appeals, contending the trial court erred by:  (1) refusing to give the jury a modified reasonable doubt instruction; (2) refusing to give a modified jury instruction about accomplice testimony; and (3) admitting certain prior consistent statements of three witnesses.  Because we conclude these contentions are without merit, we also determine Sherrors's claim of cumulative error is not well taken.  Accordingly, we affirm.

## FACTUAL BACKGROUND

### Prosecution

Steven Foth was a songwriter-musician who lived in San Francisco and ran a record store.  Foth grew up in San Diego and still had close friends there, including Grace Ko.  By the late 1990's, Foth's record store's business began to decline; Foth experienced financial problems, and by 1999, had started using crack cocaine and associating with prostitutes.  After Ko became aware of Foth's problems, she convinced him to come to San Diego for a couple of months to stay with her and get his life back in order.  In early September 1999, Foth moved into Ko's home in Mission Hills.  He was depressed and slept a lot.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

On September 29, 1999, Ko let Foth borrow her Audi and cell phone. She also gave him her Visa card so he could get gas for the car.

Lena Hixon was a prostitute and drug dealer. Michael Washington was initially her boyfriend and then her pimp. Washington was Sherrors's cousin and was Willard Hall's friend. Sometime in September, Sherrors came to San Diego from Michigan to visit. Toward the end of September, Sherrors, Washington, Hall, and Hixon stayed together in an apartment on Wightman Street with Sherrors's other family members. Around that same time, Washington left San Diego on vacation. Washington asked Sherrors and Hall to keep an eye on Hixon and supervise her drug sales.

In the early evening of September 29, 1999, Foth went to the southeast area of San Diego to get drugs. He met Hixon and asked her for cocaine. Although Hixon initially hesitated because she suspected Foth was an undercover police officer, she ultimately told him she knew where to get cocaine. Hixon got into the passenger seat of Ko's Audi and directed Foth to the Wightman Street apartment, where Sherrors and Hall were staying.

At the apartment, Hixon signaled for Sherrors and Hall to come out. They emerged from the apartment and Sherrors spoke briefly with Foth, who was still sitting in the Audi. Sherrors and Hall got into the Audi with Foth. Sherrors told Hixon they would be right back and the three men drove off.

At some point that night, Sherrors and Hall drove the Audi back to the Wightman apartment. Foth did not appear to be with them. Sherrors was driving. When Hixon did not see Foth with them, she assumed Foth was letting Sherrors and Hall use the Audi in

3

exchange for drugs, a practice that is not uncommon for drug dealers. Sherrors and Hall had Hixon get into the car and the trio drove away and entered a freeway.

After driving for a while, Sherrors exited the freeway in a rural area and pulled into a dark vacant lot. Sherrors and Hall got out of the car and instructed Hixon to stay put. The men opened the trunk and Foth climbed out. It appeared that Foth's wrists were bound. While Sherrors and Hall were struggling with Foth, Hixon got out of the car and demanded to know what was going on. Sherrors told Hixon to be quiet. At some point, Sherrors grabbed Hixon and struggled with her. During the struggle, he broke one of her acrylic nails.

Sherrors and Hall repeatedly stabbed Foth. After subduing Foth, Sherrors walked back to Hixon, handed her the knife and ordered her to stab Foth. He threatened to kill her if she did not participate. Hixon relented, took the knife, and stabbed Foth once. Hixon believed that Foth was already dead. After stabbing Foth, Hixon freaked out and dropped the knife.

Sherrors and Hall stripped Foth naked and threw his body in the bushes. Afterwards, Sherrors, Hall, and Hixon got back into the car and drove away. As they were driving, Hixon noticed that Sherrors was no longer wearing his watch. It had dropped to the ground during the struggle with Foth. As he dropped Hixon off, Sherrors threatened to harm her children if she told anyone about what happened.

Sherrors and Hall later tried to use Foth's ATM card. Although they had the correct PIN, they were unable to obtain any money from Foth's bank account because the account had insufficient funds. They also took Ko's cell phone from Foth.

4

When Sherrors returned that night to the Wightman apartment, he was wearing his shirt inside out and backwards. The shirt appeared to have blood on it. There also appeared to be blood on his shoes. Sherrors seemed upset and agitated. When asked about the red stains on his shirt and shoes, Sherrors told one family member not to worry about it and claimed to another that they were juice stains.

Sherrors later left the apartment with a bag, which he burned in the back alley. Shortly thereafter, a neighbor in the same apartment complex called the fire department because her apartment was filled with smoke that smelled of burnt plastic. It smelled like burning chemicals or burning rubber. The responding firefighters found a smoldering pile of debris, which appeared to be a burning bag. The firefighters stomped out the remains of the fire.

Sherrors and Hall kept the Audi for a few days. However, after the men saw a newscast regarding Foth's murder that mentioned the car, the Audi was burned in a nearby alley.

Within days after the murder, sometime in early October, Hixon went to the home of her close friend, Eric Bazile. She was frantic and explained to Bazile and two friends who were with him that she had gotten into some trouble and had witnessed a murder. She told them that two men were involved in the murder and explained that they burned the victim's car later. Bazile urged Hixon to call the police, but she refused. One of Bazile's friends, who heard Hixon's account, contacted the police and reported what Hixon had told them. Shortly thereafter, police arrested Hixon. While she was in jail, she called Bazile and asked him to connect a three-way call with Sherrors and Hall.

A little over a month after the murder, when Washington had returned to San Diego, he asked his friend Mikiisha Perine to store some things in her home. Later, as Perine was preparing to move, she looked through the items Washington had brought. Among those items were a blue purse containing Hixon's social security card, Ko's Visa and Costco cards, Foth's ATM card, and three of Foth's business cards. Perine called Ko, who alerted the police.

In the late afternoon of September 30, a worker discovered Foth's naked body in a brushy area and pointed it out to his manager, who called the police. Responding officers determined that Foth was dead and found a number of items at the scene, including a shirt, a pair of size eight sneakers, a Seiko wristwatch with a metal face, a broken fingernail, and a pair of bloodstained white socks. They found an open pocketknife with blood stains on the blade. Police also found a large bloodstain on the ground where the blood had soaked into the dirt two inches deep, and drag marks on the ground leading from the stain toward the fence where Foth's body had been tossed. The police determined that a shoe print in the soil was left by a person wearing a size 12 or 13 shoe. Sherrors wore that same shoe size.

The autopsy showed that Foth had suffered over 80 stab wounds to his upper chest, neck, and face. He had defensive wounds on his hands. He also sustained blunt force trauma injuries to the head. The body tested negative for the presence of drugs. Foth bled to death as a result of the stab wounds.

As they investigated the burnt Audi, police found two cigarette butts on the floor inside the car. Sherrors's DNA was on one of the cigarette butts. Police discovered that

6

someone unsuccessfully attempted to use Foth's ATM card at two different locations, including at a convenience store. Police also found that someone used Ko's cell phone to call Washington's pager. When police arrested Sherrors and Hall, they found that Sherrors had Washington's pager number written on a piece of paper. They also found that Hall had Foth's class ring in his pocket.

After her arrest, Hixon told police that she had committed the crime with two men named Benjamin Wilson and Terrence Smallgreen and that Smallgreen had lost his watch and left his shirt at the scene. She did not want to relate what had happened because she was afraid Sherrors would retaliate against her and her family. Eventually, Hixon explained to police that Sherrors and Hall killed Foth.

In exchange for her testimony at the first trial, Hixon agreed to plead guilty to conspiracy to sell cocaine and assault with a deadly weapon. Under the terms of the plea agreement, Hixon was sentenced to 12 years in state prison and ended up serving 10 years three months. At the time of Sherrors's retrial, she had been released from prison and was no longer on parole.

Defense

Testifying on his own behalf, Sherrors denied stabbing and killing Foth. He said he took a bus to San Diego to visit family members, including Jimmie Washington (Jimmie). After arriving in San Diego, Sherrors met Michael Washington, Hall, and Hixon. Michael Washington told him he was selling crack and Hixon was his girlfriend. Sherrors later learned she was a prostitute and Washington was her pimp, but he never knew she also was selling drugs.

7

When Washington left town for two or three weeks in late September, Hixon did not go along; however, Washington never put Sherrors and Hall in charge of her. Sherrors saw Hixon at the apartment every day, but he was not keeping an eye on her. While Washington was away, she was mainly hanging out with Hall, and occasionally with Jimmie, with whom she had a sexual relationship. Sherrors also had sex with her when Washington was out of town, twice before and once after September 29.

Sherrors could not recall the first thing he did on September 29, but he was most likely in the apartment during the day, then back and forth between it and Latrina Sherrors's (his sister) apartment downstairs in the evening. He did not recall coming in later that night and was not sure if he was wearing a white shirt backwards. He could have been playing basketball, since he played regularly, but he did not know if he played that evening. He never called Washington, either that night or any other time. Sherrors said the watch found at the scene of Foth's death was not his.

A "smoker rental" is a transaction where an addict trades the temporary use of a car in exchange for cocaine for a period of time which can vary from two hours to 10 days. Sherrors saw Hixon, Michael, and Jimmie with smoker rentals, and there was always a "rental" of some sort available within two days of when he arrived in San Diego.

Hixon had the black Audi when it showed up in the neighborhood in late September. Sherrors did not initially ask where it came from, but he later asked Jimmie, who said it belonged to Hixon's mom. The car was there for a few days. Because it was a rental car, Sherrors was in it several times, as were various other people, including Hall,

8

Hixon, and Leticia. Sherrors admitted lying to police during the investigation when they asked him whether he had ever been in the Audi. He admitted that he had actually been in that car.

Sherrors overheard Hixon and Jimmie talking about the murder. Hixon said the man who was killed was a regular customer. Although neither ever directly said what occurred, Sherrors thought Jimmie was upset with Hixon because they wanted some money and were trying to rob Foth, but he was broke. Sherrors testified he had nothing to do with Foth's murder.

Sherrors also presented evidence in an attempt to impeach the testimony of his sister who testified for the prosecution. He tried to establish that his sister was a liar.

DISCUSSION

Sherrors contends the court erred in failing to give two pinpoint instructions and admitting hearsay testimony from three separate witnesses. We reject these contentions.

I

*JURY INSTRUCTIONS*

A. Standard of Review and the Law

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given.

9

(*Ibid*.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid*.) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1172.) It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues. (*Ibid*.; see *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7.)

## B. Reasonable Doubt Instruction

The trial court instructed the jury regarding reasonable doubt, using the standard CALCRIM No. 220 instruction:

> "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.
>
> "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove the defendant guilty beyond a reasonable doubt. Whenever I tell you that the People must prove something, I mean they must prove it beyond a reasonable doubt.
>
> "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not

10

eliminate all possible doubt because everything in life is open [to] some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

During the jury instruction conference, Sherrors's trial counsel requested that the court provide a modified instruction, which would have altered the last sentence of the given instruction with language from the former CALJIC No. 2.90 instruction:  "It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to an evidentiary certainty of the truth of the charge.  In other words, you must find the defendant not guilty unless you are reasonably persuaded to a near certainty of the truth of the charge."

In the alternative, Sherrors's trial counsel requested the court provide what Sherrors refers to as the federal pattern instruction on reasonable doubt instead of the CALCRIM version.  This version states:

"The law presumes a defendant to be innocent of crime.  Thus a defendant, although accused, begins the trial with a 'clean slate' -- with no evidence against him.  And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused.  So the presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

11

"It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense--the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.

"The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.

"The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

"So if the jury, after careful and impartial consideration of all the evidence in the case, has a reasonable doubt that a defendant is guilty of the charge, it must acquit. If the jury views the evidence in the case as reasonably permitting either of two conclusions--one of innocence, the other of guilt--the jury should of course adopt the conclusion of innocence."

The trial court declined to provide either the modified instruction or the federal version regarding reasonable doubt. Sherrors contends it was reversible error for the trial court to refuse to do either. He further argues his requested instructions were akin "to a request for a pinpoint instruction focusing the jury's attention on the relationship between the reasonable doubt standard of proof and the defense theory that evidentiary certainty was impossible under the circumstances" of this case. Put differently, Sherrors did not link his request for a modified reasonable doubt instruction or for the federal instruction to any specific evidence or defense theory. Instead, he argues a modified instruction was necessary because the prosecution's evidence was weak and its witnesses unbelievable. Sherrors, however, does not argue that the instruction regarding reasonable doubt

12

provided to the jury was an incorrect statement of law or misinformed the jury. Indeed, he could not make a colorable argument on either ground. The trial court merely provided the jury with the pattern instruction regarding reasonable doubt. (See CALCRIM No. 220.)

Sherrors cites a litany of cases discussing reasonable doubt and the need for pinpoint instructions. Nevertheless, none of the cases on which he relies addresses the specific issue presented here. The court gave the appropriate CALCRIM instruction on reasonable doubt, but the defendant argues it should have been modified to focus the jury on the weakness of the prosecution's evidence. Our independent research has not uncovered a case that supports this principle. In other words, we find no authority that a modified reasonable doubt instruction is needed simply because a defendant generally argues the prosecution's evidence is weak.

We, however, acknowledge that there are instances in which a pinpoint instruction involving reasonable doubt is appropriate. For example, in *People v. Sears* (1970) 2 Cal.3d 180 (*Sears*), our Supreme Court provided an illustration of a pinpoint instruction that related the reasonable doubt standard to the defense theory. There, the defendant was prosecuted for first degree murder under both felony murder and premeditation and deliberation theories. (*Id*. at pp. 184-185, 189.) As to the latter theory, the defense requested the court instruct the jury as follows:

> "In determining whether in regard to premeditation and deliberation
> reasonable doubt exists, as that term has been previously defined,
> you may consider any of the following evidence:
>
> "1. The lack of motive;

13

"2. The defendant's prior relationship with the child;

"3. The defendant's prior consumption of alcoholic beverage;

"4. The presence of the defendant at King's Tavern immediately prior to his going to the scene;

"5. The defendant's parking of his vehicle in sight on Merriman Avenue prior to entry of the cottage;

"6. Any other evidence tending to prove reasonable doubt." (*Id.* at pp. 189-190.)

Thus, the defense requested a pinpoint instruction calling the jury's attention to the evidence that it could specifically consider in determining the existence of reasonable doubt.

Our high court observed that when a trial court gives the statutorily prescribed definition of reasonable doubt, no other instruction need be given to define reasonable doubt. (*Sears*, *supra*, 2 Ca1.3d at p. 190.) However, the court also explained that the defendant has the right "to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (*Ibid.*) Therefore, the Supreme Court held that the trial court erred by failing to provide the proffered pinpoint instruction. (*Ibid.*)

Here, unlike the defendant in *Sears*, Sherrors did not ask for a pinpoint instruction relating reasonable doubt to any of the evidence presented at trial. Instead, he argues a pinpoint instruction was needed to underscore the weakness of the prosecution's case. We find no authority requiring a trial court to provide such a pinpoint instruction under the circumstances presented here. Section 1096a declares that when the statutory

14

definition of reasonable doubt is given no other instruction need be provided further defining reasonable doubt. (See § 1096a; *Sears*, *supra*, 2 Ca1.3d at p. 190.) This is precisely how the court instructed the jury here. Sherrors did not request an instruction that directed "attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (See *ibid*.) As such, no further instruction regarding reasonable doubt was required. The trial court did not error.

## C. Accomplice Instruction

During the jury instruction conference, Sherrors proposed a modification of the accomplice witness instructions. He argued that the standard instruction lowered the prosecutor's burden of proof because it allowed the jury to find him guilty if, despite Hixon's alleged lack of credibility, the jury found slight corroboration of her testimony. Sherrors proposed that the court instruct the jury that the corroborating or supportive evidence had to not only connect him to the commission of the crime, but also had to satisfy the jury that the accomplice was telling the truth. The court declined to alter the accomplice witness instruction, and instead, instructed the jury under CALCRIM No. 335:

> "If the crime of murder was committed and the murder was committed during the commission of a robbery, then Lena Hixon was an accomplice to those crimes.
>
> "You may not convict Ronnie Sherrors of murder or find the special circumstance of murder during the commission of a robbery true based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if:

15

"1. The accomplice's statement or testimony is supported by other evidence that you believe;

"2. That supporting evidence is independent of the accomplice's statement or testimony; AND

"3. That supporting evidence tends to connect the defendant to the commission of the crime.

"Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

"Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."[2]

Sherrors contends the unmodified instruction violated his due process rights because it permitted the jury to accept Hixon's testimony on only slight corroboration. He asserts that the jury should have been required to find that the supportive evidence rendered Hixon's testimony credible.[3] We disagree.

---

[2]    The court provided the jury with the same instruction as to accomplice witness testimony supporting the robbery special circumstance allegation.

[3]    Sherrors asked the court to strike the line in CALCRIM No. 335: "Supporting evidence, however, may be slight." He also asked that the court modify an additional sentence in the instruction to read: "The supporting evidence must tend to connect the defendant to the commission of the crime *in such a way that you are reasonably satisfied that the accomplice is telling the truth.*" (Suggested modification in italics).

16

Section 1111[4] establishes the requirement that the jury find an accomplice witness's testimony corroborated by other independent evidence that tends to connect the defendant with the commission of the offense. The corroborating evidence may be slight and entirely circumstantial, and it does not have to establish every element of the charged crimes. (*People v. Hayes* (1999) 21 Ca1.4th 1211, 1271.) The purpose of the corroboration is to ensure that what the accomplice witness states as to the defendant's involvement in the crime is, to a certain extent, independently verifiable. (*People v. Fauber* (1992) 2 Cal.4th 792, 834-835; *People v. Szeto* (1981) 29 Cal.3d 20, 27.) Nevertheless, the supportive evidence does not need to corroborate every facet of the accomplice's testimony. (*Ibid.*; see *People v. Alcala* (1984) 36 Cal.3d 604, 624, fn. 10 [no need for independent support for each fact accomplice testifies to].)

Here, the court's instructions to the jury regarding accomplice testimony was consistent with the controlling law. The instructions identified Hixon as an accomplice and directed the jury to view her testimony implicating Sherrors with caution. If the jury was going to rely on Hixon's testimony to convict Sherrors, the instruction required that the jury had to find independent evidence that both connected Sherrors to the commission of the crime and corroborated Hixon's testimony.

---

[4] Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Without the benefit of any authority to support his position, Sherrors now contends the trial court had to instruct the jury that the corroborating evidence needed to show that Hixon was a truthful accomplice. Put differently, Sherrors asserts that the corroborating evidence had to establish Hixon was completely credible. There exists no such requirement. As our Supreme Court has repeatedly pointed out, the supportive evidence does not have to corroborate every fact to which the accomplice testifies. (*People v. Szeto*, *supra*, 29 Ca1.3d at p. 27; *People v. Alcala*, *supra*, 36 Cal.3d at p. 624, fn. 10.) Therefore, the accomplice witness instruction the trial court gave the jury was a correct statement of law.

Moreover, the language of section 1111 states that evidence must "tend to connect the defendant with the commission of the offense," but does not include the additional language Sherrors suggests was necessary -- specifically, that the evidence had to connect him to the crime in such a way so as to reasonably satisfy the jury that Hixon was telling the truth. We cannot read more into the statutory requirement than expressly set forth by the Legislature. (See *People v. Morse* (2004) 116 Cal.App.4th 1160, 1165 ["Our task is to give [the statute] the meaning expressed, for '[i]f the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history' "]; *People v. Sharp* (2003) 112 Cal.App.4th 1336, 1342 [judicial function is to ascertain what is in the terms and substance of the statute, not to insert what has been omitted].)

Finally, Sherrors overlooks the fact the court instructed the jury regarding the credibility of witnesses in general, providing the form CALCRIM No. 226 instruction:

18

"You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.

"You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:

"How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

"How well was the witness able to remember and describe what happened?

"What was the witness's behavior while testifying?

"Did the witness understand the questions and answer them directly?

"Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

"What was the witness's attitude about the case or about testifying?

"Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

"How reasonable is the testimony when you consider all the other evidence in the case?

"Did other evidence prove or disprove any fact about which the witness testified?

"Did the witness admit to being untruthful?

"What is the witness's character for truthfulness?

"Has the witness been convicted of a felony?

"Has the witness engaged in conduct that reflects on his or her believability?

"Was the witness promised immunity or leniency in exchange for his or her testimony?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or they make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

"If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her, you may conclude from the lack of discussion that the witness's character for truthfulness is good.

"If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

"If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

As such, the jury was thoroughly instructed regarding evaluating a witnesses's credibility. Sherrors's primary argument that the accomplice instruction should have been modified is based on his belief that Hixon was not a believable witness. However, the court sufficiently instructed the jury as to the need for other evidence to corroborate Hixon's testimony about Sherrors as well as detailing how the jury was to evaluate witness credibility. We are confident the jury could understand and correlate these instructions and properly apply them. (See *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) We therefore determine there was no error.

20

## II

### *HEARSAY EVIDENCE*

### A. Standard of Review and the Law

Sherrors challenges the trial court's admission of certain prior consistent statements from three witnesses. Generally, a prior statement that is consistent with trial testimony is inadmissible hearsay if offered to support the trial testimony. (Evid. Code, §§ 791, 1236; *People v. Riccardi* (2012) 54 Ca1.4th 758, 802.) However, an exception to this rule applies if there has been a claim that a witness's trial testimony "is recently fabricated or is influenced by bias or other improper motive, and the [prior consistent] statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).) Under such circumstances, the prior consistent statement is relevant to establish that the current statement is truthful.

We review the trial court's decision to admit prior consistent statements for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725 (*Waidla*).)

### B. Douglas Griffey's Testimony[5]

Douglas Griffey was five years old at the time of Foth's murder and lived with his parents at the Wightman Street apartment. One evening, he recalled seeing Sherrors come home with blood on his shirt and shoes. When Griffey asked Sherrors what was on his shirt, Sherrors responded that it was juice. Sherrors changed his clothes and then left the apartment again. Sometime thereafter, Griffey recalled Sherrors burning a car.

---

[5] Griffey testified at Sherrors's first trial. His testimony from the first trial was admitted at Sherrors's retrial.

During cross-examination, defense counsel asked Griffey about a conversation he had with a defense investigator the Friday before he testified in which he talked about things he remembered. As cross-examination proceeded, counsel asked Griffey about specific things he and the defense investigator talked about. Griffey gave an account of several improbable facts, including that he watched Sherrors and others stab and kill the victim in the back alley; saw the killers hack the victim's body into pieces with a ninja sword and toss the victim's limbs into the trash; and witnessed the murderers blow up the car with a bomb and then dump the car pieces into the garbage.

In response to Griffey's trial testimony, the prosecutor asked to introduce Griffey's prior statement to a police officer. The prosecutor argued that Griffey's trial testimony could be construed as recently fabricated. This was underscored by the fact that Griffey had allegedly related his fantastical tale for the first time to the defense investigator in the week prior to his testimony. The court agreed that the cross-examination raised an inference that Griffey was fabricating his trial testimony and therefore ruled that Griffey's prior consistent statement was admissible. Accordingly, the prosecutor introduced testimony from a police officer who assisted in securing the Wightman Street apartment when officers arrested Sherrors about two weeks after the murder. The officer explained that while she was at the apartment, Griffey spontaneously told her that he had seen Sherrors come home with blood on his shirt.[6]

---

[6] Although prior consistent statements are generally admissible for their truth (*People v. Crew* (2003) 31 Ca1.4th 822, 849-850), the trial court gave the jury a limiting

Sherrors maintains that Griffey's spontaneous statement to the police officer did not qualify as a prior consistent statement because there was no insinuation or implication at trial that he had recently fabricated his testimony. We disagree. The first time Griffey recounted the incredible story that he personally witnessed Sherrors stab and chop the victim into pieces and blow up a car was as the defense cross-examined him about what he had related to the defense investigator the week before he testified. Thus, we agree with the trial court that the cross-examination raised a reasonable inference that Griffey's quite different trial account was recently fabricated, either by Griffey or by someone coaching him. (Evid. Code, § 791, subd. (b).) We are satisfied the trial court did not abuse its discretion when it permitted the prosecutor to introduce Griffey's prior statement to the police officer, which was consistent with his trial testimony that he saw Sherrors with blood on his shirt. (See *Waidla*, *supra*, 22 Ca1.4th at p. 725.)

## C. Latrina Sherrors's Testimony

Latrina Sherrors is Sherrors's sister. At the time of the murder, she lived in Long Beach and had come to San Diego when Sherrors came to visit from Michigan. She was staying at the Wightman Street apartment. At trial, Latrina testified that she recalled the watch Sherrors wore around the time of the murder and she identified that watch, which police recovered from the crime scene, in court. She also recalled an evening when Sherrors came home and had red stains on his shirt and shoes. She noted that he acted strangely that evening. Sherrors went into the bedroom and took the shirt and shoes off.

instruction that this evidence was not to be taken for its truth but for the purpose of evaluating Griffey's credibility.

When Latrina asked Sherrors about the red on his clothes, he snapped at her, "Shut the fuck up." Later that evening, Latrina saw Sherrors leave the apartment with a white bag.

On cross-examination, the defense elicited that Latrina harbored animosity toward Sherrors and his side of the family. Even though he was her brother, she testified that she believed Sherrors should go to prison. She also explained that she was on the prosecutor's side. The defense also asked Latrina about hearing voices and hallucinating and whether she made answers up and told stories. Latrina denied hallucinating and lying.

In response to Latrina's cross-examination, the prosecutor moved to admit prior statements Latrina made to friends in the days after the murder as well as statements she made to a detective a few weeks later. The prosecutor argued that the defense had insinuated during cross-examination that Latrina had a motive to lie and that she was colluding with the District Attorney's Office. Therefore, her statements to others before the District Attorney's Office became involved were admissible as prior consistent statements. Sherrors objected, arguing that Latrina had, at all times, fabricated and lied about what happened. The court agreed with the prosecution, finding that cross-examination had raised an inference that Latrina harbored animosity toward her brother and was willing to fabricate her testimony to assist the prosecution. Therefore, the court permitted the prosecutor to introduce her prior consistent statements.

The prosecution then offered evidence of Latrina's prior consistent statement as follows. Within days after the murder, when Latrina returned to Long Beach, she told two of her closest friends that she had seen her brother come home one evening with

24

blood on his shirt and shoes. About three weeks later, a detective interviewed Latrina and asked her to describe her brother's watch. After she described it, the detective showed her a picture of the watch police recovered at the crime scene. Latrina identified it as belonging to Sherrors. Latrina also told the detective about having seen blood on Sherrors's shirt and shoes. A week later, the detective brought the watch to Latrina and she identified it as Sherrors's.

Here, Sherrors insists that Latrina's animosity toward him and his family predated her conversations with her friends and the detective. Therefore, he asserts that her statements to those individuals did not qualify as prior consistent statements because the bias or motive for fabrication already existed when she spoke with them. We are not persuaded.

We reiterate that in reviewing alleged errors regarding the admission of evidence, we adopt the deferential abuse of discretion standard. (See *Waidla*, *supra*, 22 Ca1.4th at p. 725.) "While the concept 'abuse of discretion' is not easily susceptible to precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded ' "the bounds of reason, all of the circumstances before it being considered. . . ." ' " (*Troxell v. Troxell* (1965) 237 Cal.App.2d 147, 152.) "A decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citations.] In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate

25

objectives and, accordingly, its discretionary determinations ought not be set aside on review." (*People v. Preyer* (1985) 164 Cal.App.3d 568, 573-574.)

Here, we have the benefit of the trial court explaining its decision after observing the cross-examination of Latrina: "I think the insinuation has been presented that she was – that she was not truthful certainly as part but also that she was hallucinating, that she was creating with motive to actually create the testimony because she doesn't like Mr. Sherrors and that she would be as a representative of the team willing to – to fabricate or create testimony. [¶] And therefore, that places her entire testimony into the – into the realm of a fabrication, and she can be rehabilitated with prior consistent statements on those factors." Thus, the trial court believed the cross-examination effectively suggested Latrina would create testimony because she: (1) disliked Sherrors; (2) wanted to help the prosecution; and (3) was hallucinating. Here, Sherrors only argues that Latrina had motivation to lie prior to testifying at trial because she harbored animosity against Sherrors. However, as the trial court noted, the defense attorney provided three reasons why Latrina was fabricating her testimony, two of which would not have supported Sherrors's argument that Latrina had motive to lie prior to testifying at trial. In making the prior consistent statements to her friends about what she had witnessed, Latrina could not have been motivated to help the prosecution because she was unaware, at that time, the prosecution was proceeding against Sherrors. Moreover, the implication that Latrina's trial testimony was created or somehow influenced by her hallucinations also opened the door for the prosecution to rehabilitate Latrina with prior consistent statements. (See *People v. Noguera* (1992) 4 Cal.4th 599, 629 (*Noguera*) ["[A] prior

26

consistent statement is admissible as long as the statement is made before the existence of any one of the motives that the opposing party expressly or impliedly suggests may have influenced the witness's testimony."].)

Against this backdrop, we cannot say the trial court's decision to admit Latrina's prior consistent statements was arbitrary or irrational. (See *People v. Preyer*, *supra*, 164 Cal.App.3d at pp. 573-574.) As such, we determine the trial court did not abuse its discretion.

### D. Hixon's Testimony

Hixon testified that she told her friend Eric Bazile about the murder and that he encouraged her to contact the police. She did not want to talk to the police because she was afraid of what Sherrors might do to her or her family. When she was arrested and spoke with police, she fabricated who was involved in the murder. After her arrest, she called Bazile from jail and revealed that Sherrors and Hall were the killers. Eventually, she told the police that Sherrors and Hall were the murderers.

During cross-examination, the defense pointed out that Hixon had lied to police in her initial interviews. The defense also asked her extensively about the plea agreement she made with the prosecution. Specifically, the defense asked Hixon about her strong motivation to avoid a life sentence in prison and how her plea agreement ensured she would only serve a relatively short determinate term.

Given the defense effort to show that Hixon was motivated to lie and fabricate based on her plea agreement, the prosecutor moved to admit Hixon's statements to Bazile when she called him from jail and identified Sherrors and Hall as the murderers. Sherrors

27

objected. He argued that there was never any insinuation through cross-examination that Hixon recently fabricated her testimony. Instead, he urged that since the commission of the murder, Hixon had consistently lied about the identity of the murderers. Therefore, he argued that her statements to Bazile after her arrest did not qualify as prior consistent statements because they did not predate her motivation to lie or fabricate.

The court granted the prosecutor's motion. Bazile then testified that after Hixon was arrested, she called him from jail and asked him to make a three-way call to the Wightman Street apartment where Sherrors and Hall were staying. Hixon revealed that Sherrors and Hall were the murderers.

Here, Sherrors contends Hixon had a motivation to lie since her arrest. In addition, although he acknowledges her later plea agreement could be new motivation to fabricate, he asserts that the cross-examination did not raise an inference that her plea agreement created a new incentive to fabricate. We disagree.

A prior consistent statement is admissible "if it was made before the existence of any one or more of the biases or motives that," according to the defense's "express or implied charge, may have influenced the witness's testimony." (*Noguera*, *supra*, 4 Cal.4th at p. 629.) Sherrors contends that the prosecutor brought up Hixon's plea agreement on direct examination and that the defense questions about it did not raise an implied charge that the plea agreement influenced her testimony. While the prosecutor did indeed ask Hixon to explain that she entered a plea agreement in which she ended up serving over 10 years in state prison, the prosecutor did not inquire about the possible prison exposure Hixon faced prior to her plea. Sherrors explored this in cross-

28

examination: the defense elicited that Hixon faced a possible life sentence without the possibility of parole; explored her fear of going to prison for the rest of her life; and pointed out that under the terms of the plea agreement, which required her to tell the truth, she was able to avoid a more severe punishment. This questioning raised an implied charge that the plea agreement was a strong motivator, over and above the initial arrest, for Hixon to fabricate. " 'The mere asking of questions may raise an implied charge of an improper motive.' " (*Id.* at p. 630, quoting *People v. Bunyard* (1988) 45 Cal.3d 1189, 1209 [defense counsel's cross-examination strongly implied that the witness's testimony for the prosecution had been fabricated or influenced by a motive to avoid incarceration].)

On this record, we are satisfied the trial court did not abuse its discretion in admitting prior consistent statements of Hixon.

### III

### *CULMULATIVE ERROR*

Sherrors contends the cumulative effect of the asserted errors rendered caused a miscarriage of justice affecting the trial's outcome and necessitating reversal of the judgment. Because we hold no errors exist, this cumulative error argument necessarily fails. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative effect of errors when no error]; *People v. Butler* (2009) 46 Cal.4th 847, 885 [rejecting cumulative effect claim when court found "no substantial error in any respect"].)

29

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

McDONALD, J.