Filed 6/10/15  P. v. Razavi CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# <u>COPY</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075334 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F04344) |
| v. | |
| MICHAEL MASSI RAZAVI, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Michael Massi Razavi was convicted of two misdemeanor counts of domestic violence, two counts of making criminal threats, one count of inflicting corporal injury on his wife, and two misdemeanor counts of willfully causing a child to suffer unjustifiable physical pain or mental suffering.  The trial court sentenced defendant to state prison for an aggregate term of five years four months and an additional three years in county jail.

1

On appeal, defendant contends the trial court abused its discretion and violated his constitutional rights by basing its sentence, in part, on defendant's decision to plead not guilty and exercise his right to trial. We disagree and will affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

Defendant married M. Razavi in 1995. They had three daughters, Ka., Kar., and Kr. The relationship deteriorated over the years, and defendant became physically and verbally abusive towards M. The mistreatment began with yelling and name calling, and eventually escalated to hitting, kicking, and pushing. Defendant would also, on occasion, hit his daughters.

In 2007, M. called the police to report that defendant had hit, kicked, and pushed her into a table. The children were removed from the home by Child Protective Services (CPS) and M. recanted her allegations, at defendant's direction, in order to get them back.

Defendant and M. divorced in 2008, but remarried in February 2011. Defendant filed for divorce a second time in October 2011, less than one year later. Despite the pending divorce, defendant and M. were still living together at the time of the events described below.

On January 20, 2012, defendant and M. got into an argument about M.'s unemployment. The quarrel occurred in the presence of all three of the couple's daughters. At some point, M. decided to record the argument using her cell phone. During the ensuing jury trial, M. testified that she made the recording, "Because I was afraid [defendant] was going to hurt me. And, if he did, I wanted him to be held accountable for his actions."

The audio recording was played for the jury. On the recording, defendant can be heard calling M. a "whore," "cunt," and "piece of shit." Defendant can also be heard threatening to "cripple" M. and "cut [her] fuckin' hands off." He boasts, "I'm not afraid of cops . . . . Do you understand that? Huh? I'll fuckin' shoot you right here, mother fucker, and have all the kids go to fuckin' CPS."

2

A short time later, defendant retrieved a loaded gun from his gun safe and pointed the weapon at M. Defendant's 14-year-old daughter, Ka., tried to stop him, but was pushed away. On the tape, Ka., and her 11-year-old sister, Kr., can be heard begging defendant to stop. Defendant responds by telling Ka., "if you stand in my way, I'll crush you. Do you understand that? I'm dealing with her, okay. I need for her to leave. She does not love you, do you understand?" M. stopped taping shortly thereafter, when the argument appeared to subside.

The argument resumed later that night, and M. started taping again. In the continued recording, which was also played for the jury, defendant orders M. to sleep on the living room floor, saying, "I said sleep on the floor (unintelligible) you sleep right there or on the fucking couch, motherfucker, like you have for years. 'Kay? Fuck you cunt. I'm gonna make you as uncomfortable as fuckin' possible. Flatten your tires. Fuckin' cut your hair. Shit on your head while you're sleeping. Yeah, motherfucker. Now you know what it's like to be a piece of shit. You're [a] fuckin' cat, fuckin' shit on my plants. And I wanna shoot you. Would you like to move out tonight? Hello. I asked you a question. Would you like to move out tonight?"

Moments later, M. can be heard saying "Ow" as defendant repeatedly kicks her bare foot, which was recovering from a broken bone. Defendant then started hitting M. with an open hand on the side of her head. The children again tried to intervene, and defendant stopped them, warning, "Do you know who I am? No, you don't. So fuck off . . . . So you get along with me, because you know I will take on a whole fuckin' SWAT team. You understand who I am? I am one bad ass motherfucker." The recording ends with M. imploring defendant to "leave me alone" and locking herself in a bathroom. As M. would later explain, she did not call the police that night because she was "afraid [defendant] would kill us all if I called."

Months later, on May 20, 2012, the family was assembling a canopy over their backyard Jacuzzi when another argument began. Once again, M. recorded the argument

using her cell phone. This recording was also played for the jury. As before, defendant can be heard calling M. obscene names in front of the children.

The argument moved inside and defendant intentionally sprayed cleaning solution into M.'s eyes. As M. tried to flush her eyes at the kitchen sink, defendant repeatedly struck her with an electric fly swatter. He then began slapping her about the head with an open hand, while Ka. and Kr. begged him to stop.

During the incident, M. became convinced that defendant was going to kill her. She told her daughters to pack their bags so they could leave the house. As M. prepared to leave, defendant threatened to "fucking put a fucking bullet in [her] head." At one point, he threw her to the ground and began choking her. Ka. intervened and managed to push defendant away. Defendant then went after Ka., shoving her into a closet, and later threatened to kill her mother. M. and Ka. eventually left the house and drove to a friend's house. The friend called police, who responded to the family residence, picked up Kar. and Kr., and reunited them with their mother and sister.

During the trial, Ka. testified that she saw defendant hit M. and spray cleaning solution into her eyes on the evening of May 20, 2012. Ka. testified that defendant was violent with M. a lot. She also testified that defendant pushed her into a closet during the May 20, 2012, argument, and had been violent with her on other occasions as well. She explained that her life was a lot less stressful now that defendant was out of the house, adding that, "Before we would feel we were walking on egg shells because we didn't want to make him angry and he would just blow up. We didn't want that. And now we are a lot happier, we have friends, we get to go out with our friends, we get to go to parties, enjoy life."

Defendant's friend Ronald T. testified about an incident that occurred in May 2011. Ronald recalled making plans with defendant to go for a motorcycle ride. When he arrived at the family home, M. insisted that defendant stay home, and threatened to call the police.

Defendant also testified. He explained that M. had become "really difficult to live with" after the birth of their daughter, Kar. Among other things, defendant said that M. had promised to get a job, but failed to do so, and had been unfaithful to him.

Defendant testified that he had been a good husband, but M. had changed. In defendant's opinion, M. had become spoiled to the point where she was unreasonable. Defendant stated that when he would try to have a normal conversation with M. about going back to work she would physically attack him.

Defendant denied having physically attacked M. in 2007. To the contrary, defendant claimed that M. attacked him. Defendant also denied having instructed M. to recant her allegations against him.

Turning to the events of January 20, 2012, defendant acknowledged that he got into an argument with M., but denied that he threatened or used force against her. He testified that M. has a black belt in karate, and attacked him using a martial arts technique known as the "lunging elbow." Defendant testified that M. had previously attacked him using the "lunging elbow," and the impact of the blow had been so forceful as to cause him to nearly pass out. On this occasion, defendant said that he retreated to recover, swearing, and threatening to call the police.

Defendant explained the abusive language on the recordings by claiming he was merely repeating things that M. said to him earlier in the day. Defendant also testified that M. threatened to call her "motorcycle friends" to come over to beat him up. According to defendant, M. told him that her friends would be disguised as police officers so that the neighbors would not become suspicious and call police.

Defendant testified that M. wanted to sleep in the living room so that she could open the door when her friends arrived. He suggested that he only asked her to sleep on a mattress pad on the floor so that he could sleep on the sofa, which was next to the door. That way, he said, he could be closest to the door in the event that M.'s friends arrived. Even then, he denied that he ordered her to sleep directly on the floor.

Defendant claimed that the sounds of struggle on the tape were the result of a tussle over a body pillow. According to defendant, M. responded with a series of exaggerated "ows," thereby creating a false impression that she was being attacked. As defendant put it, "You're hearing her say ow as I try to pull the body pillow from her. I'm not pulling it real hard, but I just wanted her to give me the body pillow and go set her bed on the floor, and she slaps my arms a couple of times, and she does a lot of screaming and makes it sound on the audio as if I'm hitting her."

Defendant testified that M. frequently carried a loaded gun around the house, and was wearing a gun under her T-shirt at the time of the January 20, 2012, incident. Defendant also testified that M. threatened him with a gun on January 20, 2012, and had previously threatened to stab him.

Turning to the events of May 20, 2012, defendant acknowledged having sprayed M. in the eyes with cleaning solution, but claimed he did so accidentally. According to defendant, he had been cleaning the kitchen counter when M. lunged at him. Defendant testified that he responded to the attack by raising his arms in a defensive gesture, thereby causing some of the cleaning solution to spray into the air. He denied that he sprayed cleaning solution into M.'s eyes on purpose. He denied hitting M. with an electric fly swatter or choking her. Defendant also denied pushing Ka.

When asked about his statement that he would put a bullet in M.'s head, defendant explained, "I was scared I was going to get hurt myself. It was kind of—I was kind of in a self-defense mode. It was one of those things that—I told her that if—what is not on the audio is the very beginning, the conversation that went on in the very beginning. And when she said she was going to stab me, I told her that I would—if she ever did that, I would have to retaliate."

*The Charges and Plea*

On October 19, 2012, the Sacramento County District Attorney's Office filed a first amended complaint charging defendant with two misdemeanor counts of domestic

6

violence against M. (Pen. Code, § 243, subd. (e)(1) [1]; counts 1 and 2), two counts of making criminal threats against M. (§ 422; counts 3 and 5), one count of inflicting corporal injury on M. (§ 273.5, subd. (a); count 4), two misdemeanor counts of willfully causing Ka. to suffer unjustifiable physical pain or mental suffering (§ 273a, subd. (b); counts 6 and 7), and one misdemeanor count of willfully causing Kr. to suffer unjustifiable physical pain or mental suffering (§ 273a, subd. (b); count 8). Defendant pleaded not guilty on all counts.

*Verdict and Sentence*

On October 25, 2013, the jury returned guilty verdicts on counts 1 through 7. The jury could not reach a unanimous verdict on count 8 and the trial court granted the prosecutor's motion to dismiss that count in the interest of justice.

Defendant appeared for sentencing on November 15, 2013. In anticipation of the sentencing hearing, the probation department prepared a report recommending a lower-term sentence of three years four months. Defendant submitted a statement in mitigation, asking the trial court to adopt the probation department's recommendation. Defendant's statement was accompanied by a letter from defendant's friend, Ronald T., describing defendant as "a very family oriented man, who has spent huge amounts of time, resource[s] and love with his family and friends always showing warmth and genuineness." The statement was also accompanied by a letter from Fred W. opining that defendant "has strong moral character . . . [who] will do something great in the community."[2]

At the sentencing hearing, M. presented a victim impact statement describing the effects of defendant's abuse on her daughters and herself, and asking the trial court to

---

[1] Undesignated statutory references are to the Penal Code.

[2] During the sentencing hearing, the trial court indicated that it had also received a letter from Ruth W.; however, that letter does not appear in the record before us.

impose "the maximum prison time."  The prosecutor also argued for an aggravated term, citing "the length of the abuse that the victim and her children went through, the frequency of that abuse, the vulnerability of the victims, both [M.] and all three children, and the physical and emotional toll that these events and this case has taken already on this family and will continue, how it will continue to affect them for years to come . . . ."

Defense counsel acknowledged the emotional impact of the audio recordings, but noted that, "We all have seen much worse examples of domestic violence than this." When the facts of the case were viewed objectively, defense counsel suggested, without the emotional intensity of the audio recordings, "what we are left with is some conduct that doesn't result in or should not result in upper term, midterm.  This really is, I think Probation does have it correct, this is a low term case."

The trial court then said that it was going to ask defense counsel a question, but counsel was "certainly [ ] not required to answer it, or try to answer it, if you'd like to." The trial court recalled, "at the commencement of this case, the District Attorney offering your client to plead, as I recall, to one count of 273.5 for an offer of time served and some minor probation."  After confirming the original plea offer, the trial court continued:

"And yet, and this is what I'm going to ask you to talk to me about, [defense counsel] because I don't get this part.  The reason the District Attorney was willing to offer such a discount rate for this type of crime, even though they had literally hours of your client making 422 type threats on audiotape that was not going to be able to be defended or disputed, they were willing to make that offer because in their estimation it would be better to save the children from the additional trauma of this trial, rather than put them through that and put them through a cross-examination by a defense counsel.

"Your client calculated that instead of taking—pleading to a count where the District Attorney had obvious strong proof against him, that is, at least a serious felony, a 422 count, and perhaps two, and to get out of jail free and to walk basically away from

this, he calculated instead, no, I will contest this and I will compel my daughter to sit in that chair and go through this trauma.

"And I sit here with letters today by people who tell me what just a magnificent man of great integrity and character [defendant] is. Maybe I'm missing it, [counsel], but the contrast between a statement of integrity and the ultimate, the ultimate final abuse to compel a daughter to do that, I'm not understanding that one, [counsel]. And again, you are welcome to comment on that or not at your choice."

Defense counsel responded, "Judge, why people—and I'm just going to speak generally because I don't know that I can really talk specifically about [defendant] in this regard. I have some theories though. Why people venture to exercise their constitutional right to go to trial and subject everyone around them to this, frankly, Judge, I gave up on trying to answer. [¶] I think, and it is my experience, and however you may fall on the issue of gun ownership, it is my experience that gun owners know when they get a felony, that they are going to lose their ability and right to own a weapon. To some people that is very, very powerful." Defense counsel went on to say that, though there was ample evidence of defendant's "dark side," there was also evidence, including the supporting letters, demonstrating that defendant could be a good father and friend, if not a good husband. The trial court thanked defense counsel for trying to answer the question, and offered the following observations:

"All right. Well, I'm just going to make a very few comments. I mean, the trial would have been so much different and approached so much differently without those astounding audio recordings. I'm confident that all of it would have been denied, every bit that was not just blaring in hideous reality on those tapes. It's really a picture of what really goes on in a domestic violence home, and it's just sickening. I don't have a better word to describe than that. It is absolutely sickening that one human being would treat another human being in that fashion with children standing by and watching.

9

"In my view, regardless of my background, [defense counsel], this defendant has done incalculable damage to this family, and particularly the children. Astounding to me, of course, he remains to this very second, defiant, unrepentant, acting like he's a victim somehow, innocent in all of this, all of which is utter nonsense.

"He is—he seems completely deluded with his own sense of self-righteousness, which he has no basis for, and his own sense of self-importance and victimhood status. Again, he has no basis for, even though he has undeniably spent years willfully inflicting horrible emotional carnage on his entire household.

"No reasonable person would listen to those tape recordings and come to a conclusion that [defendant] had one spec of humanity in his treatment of his wife, and the splash-over effect to those children, can't measure it, can't calculate it.

"The words that I heard on those tapes are words that should never be uttered between human beings. The fact that they were uttered with great violence and great anger toward a family member, toward a wife, with the children in attendance, the word that—the only word that I can describe that as is despicable. Even if someone thought those kind of thoughts toward another person, to utter them in the hearing of a nine-year-old, an eight-year-old, the daughter of that woman, can't calculate that damage.

"The family was—even if you assume that the tapes reflect the only two times or the only three times in their relationship where the defendant revealed that type of character, that would be enough to justify the term that I'm going to impose. But I have no doubt, as the daughter testified, we walked on egg shells. That's not the half of it. In great fear and in great trembling, worried that the volcano that is [defendant] was going to explode given the slightest provocation.

"I have no doubt that that family lived under that type of monstrous threat continuously. No reasonable person listening to what he said to her, what he did to her on those tapes, could come to any other conclusion.

"The sentence that I have available to me is entirely insufficient in my view to measure the gravity of the harm that this man has inflicted on these kids. He was required to care for, to protect, to nurture, to love, not only his wife, but his precious children. Instead, he not only neglected that duty, he rejects it. He instead slowly poisons them for months and maybe years with absolute hate soaked words and conduct.

"I cannot imagine a more significant betrayal by a father."

The trial court then considered the aggravating and mitigating factors set forth in the probation report. The trial court agreed with the probation department that defendant's crimes involved a high degree of cruelty, viciousness and callousness, adding, "You know, sometimes probation just throws [Cal. Rules of Court, rule 4.421(a)(1)[3]] and it really doesn't fit. It actually fits here, those three adjectives actually fit the defendant's conduct, cruel, vicious, callous." The trial court also agreed that defendant presented a serious danger to society (rule 4.21(b)(1)), but noted, as a factor in mitigation, that he had no prior record of criminal conviction (rule 4.423(b)(1)). The trial court also noted that, while defendant was eligible for probation, "probation would be completely inappropriate given the nature, the seriousness, and the circumstances of this offense."

The trial court then considered the crime-related criteria affecting the imposition of consecutive rather than concurrent sentences, noting that "the crimes in this case did involve separate acts of violence or threats of violence" and "the crimes were committed at different times and in different places, rather than being committed so close in time as to indicate a single period of aberrant behavior." (Rule 4.425(a)(2)-(3).)

The trial court then proceeded to sentencing, stating, "With regard to Count 4, which is a violation of Penal Code section 273.5, despite Probation's recommendation,

---

[3] Undesignated rule references are to the California Rules of Court.

11

which is in my view utterly incomprehensible, of course, maybe they did not hear the tapes, the defendant shall be imprisoned in the State Prison for the upper term of four years. The upper term is chosen because, in my view, the factors in aggravation far outweigh any factor in mitigation. It's not even close. The upper term is clearly appropriate in this case." The trial court imposed consecutive one-third middle terms of eight months on counts 3 and 5, for an aggregate state prison term of five years four months. The trial court also imposed consecutive one-year county jail terms on counts 6 and 7, and consecutive 180-day terms on counts 1 and 2, for a total sentence of eight years four months in custody.

Defendant filed at timely notice of appeal.

## DISCUSSION

Defendant contends the trial court abused its discretion and violated his right to due process by imposing an aggravated sentence as punishment for exercising his right to a trial. Preliminarily, we must determine whether defendant has forfeited his constitutional challenge by failing to raise the issue at sentencing. We conclude that he has.

### I

### *Forfeiture*

Ordinarily, a failure to object to discretionary sentencing choices at trial forfeits the objection on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 348 [complaint of improper sentencing factors must be made for the first time in the trial court]; see also *United States v. Vontsteen* (5th Cir. 1992) 950 F.2d 1086, 1088-1089 [failure to object to perceived vindictive sentencing results in forfeiture]; *People v. Williams* (1998) 61 Cal.App.4th 649, 653-657 [same].)

Defendant argues the forfeiture rule should not apply because the alleged error involves a deprivation of his fundamental right to a jury trial. However, defendant was afforded—and exercised—his right to trial by jury. Consequently, the alleged error

cannot be said to involve a deprivation of defendant's right to a jury trial. Rather, as the People observe, the alleged error was one of due process (*In re Lewallen* (1979) 23 Cal.3d 274, 278 (*Lewallen*)), which is subject to the forfeiture doctrine (*People v. McCullough* (2013) 56 Cal.4th 589, 593 [a constitutional right may be forfeited in a criminal case by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it]). Accordingly, we conclude that defendant has forfeited his constitutional challenge.

Defendant urges us to exercise our discretion to reach the merits of his forfeited claim. We decline to do so. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue" ], superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962].)

Although we decline to exercise our discretion to address the forfeited claim directly, we consider defendant's constitutional challenge under the rubric of ineffective assistance of counsel at Section III, *post*. Before proceeding with our analysis, however, we consider the relevant constitutional principles.

II

*Vindictive Sentencing*

A court may not chill a defendant's exercise of his constitutional right to trial either by offering a more lenient sentence in return for a guilty plea than the court would impose following a trial, or by imposing a more severe sentence because the defendant elects to go to trial. (*Lewallen*, *supra,* 23 Cal.3d 274 at p. 281.) However, the mere fact that the defendant received a more severe sentence after trial than he was offered before trial is not enough to support an inference that he was penalized for exercising his constitutional rights. (*People v. Szeto* (1981) 29 Cal.3d 20, 35.) The court may legitimately impose a more severe sentence after trial if the evidence at trial reveals more adverse information about the defendant than was known at the time the offer was made.

13

(*Lewallen*, at p. 281.) It may also impose a more severe sentence if the evidence at trial reveals additional aggravating factors pertaining to the crime than were known at the time of the offer. (See rule 4.421.)

If the court's exercise of its sentencing discretion is supported by facts in the record, we will not infer vindictiveness. We can conclude that a defendant has been penalized for exercising his right to trial only if the trial judge's comments reasonably give rise to that inference. (*People v. Szeto, supra,* 29 Cal.3d 20 at p. 35.)

For example, in *Lewallen, supra,* 23 Cal.3d 274, the defendant refused to accept a negotiated sentence. Following a jury trial, at sentencing, the defense attorney requested informal rather than formal probation. (*Id.* at p. 275.) The trial court responded: " 'I think I want to emphasize there's no reason in having the District Attorney attempt to negotiate matters if after the defendant refuses a negotiation he gets the same sentence as if he had accepted the negotiation. It is just a waste of everybody's time, and what's he got to lose. And as far as I'm concerned, if a defendant wants a jury trial and he's convicted, he's not going to be penalized with that, but on the other hand he's not going to have the consideration he would have had if there was a plea.' " (*Id.* at p. 277.) Our Supreme Court remanded for resentencing, finding that the defendant had shown "that the trial court's exercise of its sentencing function was improperly influenced by his refusal of the proffered plea bargain and insistence on his right to trial." (*Ibid.*)

In *People v. Morales* (1967) 252 Cal.App.2d 537 (*Morales*), the trial judge imposed a consecutive sentence, stating, " 'I don't think it's fair for an inmate, or anyone else, to come to Court and demand a jury trial, demand the services of the public defender . . . when there really isn't any defense to this case . . . .' " (*Id.* at p. 542, fn. 4.) The trial judge also stated that, if a defendant did not have a defense but still opted to go to trial, then " 'he should suffer some additional sanction.' " (*Ibid.*) The Court of Appeal remanded for resentencing, holding that, "a trial court cannot impose a more severe punishment on the basis of its conclusion that a defendant who has pled not guilty

14

presented a frivolous defense or one which the court concludes was presented in bad faith." (*Id.* at p. 545; see also *United States v. Medina-Cervantes* (9th Cir. 1982) 690 F.2d 715, 716 [remanding for resentencing where comments by trial judge, including statement that the defendant "was just thumbing his nose at our judicial system," gave rise to an inference that the defendant was punished more severely because he proceeded to trial].)

Relying on *Lewallen* and *Morales*, defendant argues that the trial court's comments during the sentencing hearing raise a reasonable inference that defendant was punished more severely because he declined the prosecutor's plea offer and exercised his right to a jury trial. In particular, defendant contends the trial court ventured into forbidden territory by suggesting that defendant insisted on a jury trial, despite the fact that he had no bona fide defense, as a way of inflicting an "ultimate final abuse" upon Ka., by compelling her to testify against him. We agree that the trial court's comments are troubling. However, we need not decide whether they raise a reasonable inference that defendant was punished more severely for exercising his right to a jury trial because, as we have explained, defendant has forfeited that claim. We therefore turn to the question of whether defendant has established a claim for ineffective assistance of counsel.

III

*Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel, a defendant must show " ' "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant." ' " (*In re Crew* (2011) 52 Cal.4th 126, 150; see also *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698] (*Strickland*).) " 'The burden of sustaining a charge of inadequate or ineffective

15

representation is upon the defendant.  The proof . . . must be a demonstrable reality and not a speculative matter.' "  (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

In considering a claim of ineffective assistance of counsel, it is not necessary to determine " 'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' "  (*In re Champion* (2014) 58 Cal.4th 965, 1007, quoting *Strickland, supra,* 466 U.S. at p. 697; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)  It is not enough to show that the alleged errors may have had some conceivable effect on the outcome; the defendant must demonstrate a "reasonable probability" that absent the errors the result would have been different.  (*In re Champion,* at p. 1007; *Mesa,* at p. 1008.)

Defendant contends that trial counsel's failure to object at the sentencing hearing constituted ineffective assistance.  Assuming arguendo that counsel's performance was deficient, defendant's claim still fails because he has not demonstrated a reasonable probability that he would have received a shorter sentence had an objection been made.  (*People v. Cruz* (1995) 38 Cal.App.4th 427, 433-434 [" 'When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper.' "].)

Prior to pronouncing sentence, the trial court asked defense counsel to comment on the apparent conflict between letters describing defendant as a man of integrity, and defendant's decision to turn down a generous plea offer and proceed to trial, despite seemingly overwhelming evidence against him, and the emotional toll that a trial would inevitably take on his family.  Following a brief discussion, during which defense counsel gently reminded the trial court of defendant's constitutional right to trial, the court proceeded to sentencing.  Although the trial court went on to discuss its reasons for

selecting the upper term sentence at length, the court did not refer to defendant's decision to exercise his right to a trial again.

At sentencing, the trial court described defendant's crimes as "hideous," "despicable," and "absolutely sickening," adding that, "*The sentence that I have available to me is entirely insufficient in my view to measure the gravity of the harm that this man has inflicted on these kids.*"  The trial court emphasized that defendant's crimes were "cruel, vicious and callous," and noted that defendant presented a serious danger to society.  (Rule 4.421(a)(1) & (b)(1).)  The trial court rejected the probation department's recommendation of a lower term sentence as "utterly incomprehensible" in light of the audio recordings (which the probation department might not have heard) and concluded that, "*the factors in aggravation far outweigh any factor in mitigation.  It's not even close.  The upper term is clearly appropriate in this case.*"

In light of the trial court's comments, we find no reasonable probability that defendant would have received a more favorable sentence had defense counsel objected to the court's questionable remarks, refused to answer the court's question, or reminded the court more forcefully of defendant's right to trial.  Because a single aggravating factor is sufficient to impose the upper term (*People v. Osband* (1996) 13 Cal.4th 622, 728), there is no reasonable probability that defendant would have received a more favorable sentence, even assuming the court improperly considered defendant's decision to plead not guilty and proceed to trial.  Accordingly, we find no prejudice and defendant's claim of ineffective assistance of counsel fails.  (*Strickland, supra,* 466 U.S. at p. 687.)

## DISPOSITION

The judgment is affirmed.

                                                    RENNER_____, J.


We concur:


 BUTZ_____, Acting P. J.


 MURRAY_____, J.

18